1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9              FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   FRANCISCO HURTADO,                    No.  2:19-cv-02343-DAD-AC

12                  Plaintiff,

13         v.                              ORDER GRANTING IN PART AND
                                           DENYING IN PART DEFENDANTS'
14   STATE OF CALIFORNIA, et al.,          MOTION FOR SUMMARY JUDGMENT

15                  Defendants.            (Doc. No. 23)

16

17

18         This matter is before the court on the motion for summary judgment filed on behalf of

19   defendants State of California, California Highway Patrol ("CHP"), and Officer Edgardo Yepez

20   (collectively, "defendants") on October 29, 2021.  (Doc. No. 23.)  The pending motion was taken

21   under submission by the previously assigned district judge on December 9, 2021.[1]  (Doc. No. 28.)

22   For the reasons explained below, defendants' motion for summary judgment will be granted in

23   part and denied in part.

24   /////

25   /////

26   /////

27

28   ────────────────────────
     [1]  On August 25, 2022, this case was reassigned to the undersigned.  (Doc. No. 35.)

1

**BACKGROUND**

2

A.     **Factual Background**[2]

3

This case arises from the non-lethal shooting of plaintiff Francisco Hurtado by a law

4

enforcement officer following a serious car accident involving a vehicle driven by plaintiff.

5

On March 15, 2018, Officer Randazzo and defendant Officer Yepez were in full uniform

6

in a marked CHP vehicle performing traffic enforcement on Highway 99 in Modesto.  (DUF

7

¶ 1.)[3]  Officer Randazzo saw a dark SUV (the "vehicle") travelling southbound on Highway 99 at

8

a high rate of speed; at one point, the vehicle was going 80 miles per hour ("MPH") even though

9

the speed limit was 65 MPH.   (DUF ¶ 3.)  According to Officer Randazzo's declaration, he also

10

observed the vehicle swerving.  (Doc. No. 23-3 at ¶ 3.)  The vehicle was operated by plaintiff.

11

(DUF ¶ 11.)  Plaintiff had a loaded gun in the vehicle's cup holder, though it does not appear that

12

the officers knew that at the time they were pursuing his vehicle.  (DUF ¶ 12.)

13

Officer Randazzo activated his emergency lights to pull over plaintiff's vehicle.  (DUF ¶

14

7.)  The vehicle did not pull over.  (DUF ¶ 8.)  Officer Randazzo then activated his siren, but the

15

vehicle still did not pull over.  (DUF ¶ 10.)  This pursuit lasted only approximately 15 seconds,

16

after which time Officer Randazzo decided to end the pursuit and let plaintiff's vehicle go.

17

(PUDF ¶ 16.)  At that point, Officer Randazzo turned off his vehicle's emergency lights and

18

---

19

[2]  The relevant facts that follow are undisputed unless otherwise noted and are derived from the

20

undisputed facts as stated by defendants and responded to by plaintiff (Doc. No. 30 at 2–116
("DUF")), the undisputed and disputed facts as stated by plaintiff and responded to by defendants

21

(Doc. No. 30 at 116–55 ("PUDF")), as well as declarations and exhibits attached to the pending
motion and to the opposition to the pending motion (Doc. Nos. 23-3, 23-4, 23-5, 27-3).  In

22

addition, although plaintiff purports to dispute many of the facts as stated by defendants, he does
so by repeating the fact and adding additional information to elaborate upon it.  (*See, e.g.*, DUF

23

¶¶ 7, 10.)  In other words, plaintiff does not actually dispute the fact or portions of the fact stated,
he merely provides additional information that he believes is relevant.  Thus, where plaintiff has

24

not genuinely disputed a fact or a portion of that fact, the court has treated that fact as undisputed
for the purposes of ruling on the pending motion.

25

26

[3]  Although the parties do not dispute that the date of the incident was March 1, 2018 (DUF ¶ 1),
given that the parties elsewhere consistently refer to the incident as having occurred on March 15,

27

2018 (*see, e.g.*, DUF ¶ 44; PUDF ¶ 41), the undersigned assumes that the date agreed to as March
1, 2018 is a typographical error and that the parties intended to agree that the incident occurred on

28

March 15, 2018.

1  siren. (*Id.*) Due to the short duration of the pursuit and their decision to let the vehicle go, the

2  officers did not call in the pursuit. (PUDF ¶ 17.)

3        According to plaintiff, he did not realize the police lights were directed at him, and he did

4  not hear any sirens. (PUDF ¶ 19.) As plaintiff was exiting the highway, he saw no lights, but he

5  looked back because he thought he might have previously seen lights. (PUDF ¶¶ 18, 19.) When

6  he looked forward again, he saw the stop sign and other cars. (PUDF ¶ 19.) Plaintiff tried to

7  brake, but his brakes locked, and his vehicle did not stop. (*Id.*) The vehicle went through a fence,

8  down a steep embankment, and turned upside down such that it was resting on its roof. (PUDF ¶

9  21.)

10        Officer Randazzo and defendant Officer Yepez pulled over on the off-ramp, exited their

11  vehicle, and saw the overturned vehicle containing plaintiff. (PUDF ¶¶ 20–21.) It appeared to

12  the officers to be a severe accident. (PUDF ¶ 26.) Officer Yepez radioed dispatch to request the

13  fire department and an ambulance because the officers presumed that whoever was in the vehicle

14  would be injured. (DUF ¶ 19.) Officer Randazzo then went down the embankment to determine

15  if he could assist the vehicle's occupants. (DUF ¶ 18.) Officer Randazzo approached the driver's

16  side of the vehicle. (DUF ¶ 23; PUDF ¶ 26.) As he was approaching the vehicle, Officer

17  Randazzo heard plaintiff moaning. (PUDF ¶ 26.) He saw plaintiff's torso lying on the vehicle's

18  interior roof because the vehicle was upside down. (DUF ¶ 25.) According to Officer Randazzo,

19  because of plaintiff's prior high-speed driving, swerving, and failing to pull over, he commanded

20  plaintiff several times to show his hands and stop moving, and he also informed plaintiff that they

21  were trying to extricate him from the vehicle. (Doc. No. 23-3 at ¶ 13.)

22        Initially, when Officer Randazzo was looking at plaintiff's torso inside the vehicle from

23  two feet away, he did not see a gun. (PUDF ¶ 30.) Officer Randazzo also does not remember

24  seeing plaintiff trying to get onto his knees. (PUDF ¶ 38.) Rather, he remembers plaintiff

25  wiggling from left to right on his stomach as he was still in a prone position. (*Id.*) As he was

26  looking at plaintiff, Officer Randazzo's flashlight shined on a gun which was on the right side of

27  plaintiff's torso. (Doc. No. 23-3 at ¶ 15.) Under Officer Randazzo's version of events, the gun

28  was a foot from plaintiff and well within his reach. (*Id.*) According to Officer Randazzo, when

1    he saw the gun, he again commanded plaintiff not to move and he took cover. (*Id.* at ¶ 16.) He

2    then called out to his partner to alert him of the weapon. (*Id.*) Because he was taking cover,

3    Officer Randazzo did not reach for his own weapon. (*Id.*) Officer Randazzo testified at his

4    deposition that he never saw plaintiff touch the firearm or move towards it. (Doc. No. 27-3 at

5    127.) According to Officer Randazzo's declaration, whilst moving backwards to take cover, he

6    was looking down to avoid tripping over large weeds and lost sight of plaintiff as he did

7    so. (Doc. No. 23-3 at ¶ 16.)

8          When Officer Randazzo was about halfway down the embankment, defendant Officer

9    Yepez headed down the embankment toward plaintiff's overturned vehicle. (DUF ¶ 20.) At that

10   time, defendant Yepez did not believe this was a high-risk traffic stop, and he did not have his

11   gun drawn.   (PUDF ¶ 80.) Defendant Yepez approached the vehicle's rear and shined his

12   flashlight inside to determine if he could get plaintiff out from the rear of the vehicle. (DUF

13   ¶¶ 29, 30.) According to defendant Yepez's declaration, when he heard his partner yell "gun," he

14   crouched and saw plaintiff crouched on the roof of the car in the center area close to the driver's

15   seat. (Doc. No. 23-4 at ¶ 9.) At that vantage point, according to defendant Yepez, he could see

16   plaintiff's right shoulder, right arm, right hand, buttocks, knee, and both feet. (*Id.*) He also states

17   that he spotted the gun next to plaintiff's feet on the right side of his right foot and that he then

18   observed plaintiff put his right hand on the gun and that he appeared to grab it. (*Id.*) Defendant

19   Yepez declared that approximately a second and a half passed between when he first saw the gun

20   and when he saw plaintiff reach for it. (*Id.*) Defendant Yepez then fired four rounds toward

21   plaintiff, and he states that he did so because he feared for the safety of himself and Officer

22   Randazzo, who was close to the driver's side door of the vehicle at the time. (*Id.* at ¶ 10.)

23   Plaintiff was shot on the right side of his buttocks, his right upper thigh, and his right ankle/foot.

24   (PUDF ¶ 105.)

25          Before shooting, defendant Yepez did not issue any commands or warnings to plaintiff.

26   (PUDF ¶ 96.) Plaintiff was not actively resisting arrest or attempting to evade arrest by flight at

27   that time. (PUDF ¶ 93.) Defendant Yepez has also testified that plaintiff was not committing any

28   crime when he shot him. (Doc. No. 27-3 at 166.)

4

1          Plaintiff testified that after the accident, he was lying in a belly flop position with his face

2    down on the inside roof of the vehicle.  (Doc. No. 27-3 at 28, 39.)  Plaintiff testified that he did

3    not hear anyone speak to him or either officer directing him to show his hands or stop moving.

4    (*Id.* at 38.)  He also testified that he did not grab or reach for the gun in his car at any point after

5    the accident occurred.  (*Id.* at 31.)

6          According to plaintiff's reconstruction and forensic biomechanical expert, Jesse L.

7    Wobrock, Ph.D., plaintiff was on his belly, facing away from defendant Yepez when he was shot.

8    (Doc. No. 27-3 at 276.)  Based on his analysis of the bullet trajectories, Dr. Wobrock prepared the

9    following trajectory diagrams:



19   (*Id.*)  Dr. Wobrock concluded that plaintiff was moving slightly at the time of the four shots and

20   that all four shots came from the rear.  (*Id.* at 275–76.)  He further concluded that plaintiff did not

21   have a gun in his hand at the time he was shot and that he was falling in and out of consciousness

22   because of the severe car accident that had just occurred.  (*Id.* at 276.)

23         Plaintiff pleaded no contest to the misdemeanor offense of evading an officer and to the

24   felony offense of possessing a loaded weapon in connection with the events of March 15, 2018.

25   (DUF ¶ 44.)

26   **B.**    **Procedural Background**

27         On April 2, 2019, plaintiff filed a complaint in Stanislaus County Superior Court initiating

28   this action.  (Doc. No. 1.)  Defendants removed the case to this federal court on November 19,

1   2019 on the basis of federal question jurisdiction.  (*Id.*)  Plaintiff filed his second amended

2   complaint ("SAC") on December 12, 2019, asserting two constitutional claims under 42 U.S.C. §

3   1983 against defendant Yepez:  (1) unreasonable search and seizure, unreasonable and/or

4   excessive force and denial of medical care; and (2) violation of substantive due process.  (Doc.

5   No. 9 at 9–11.)  In addition, in his SAC, plaintiff has brought state law claims against defendants

6   Yepez, the State of California, and the CHP for:  (3) battery; (4) negligence; and (5) violation of

7   California Civil Code § 52.1  (*Id.* at 13–16.)  Pursuant to a joint stipulation of the parties,

8   plaintiff's claims based upon the alleged denial of medical care in plaintiff's first and fourth

9   claims for relief, as well as his fifth claim seeking relief under California Civil Code § 52.1 (Bane

10  Act), have all previously been dismissed.  (Doc. No. 18.)

11          On October 29, 2021, defendants filed the pending motion seeking summary judgment in

12  their favor as to all of plaintiff's remaining claims.  (Doc. No. 23.)  On December 2, 2021,

13  plaintiff filed an opposition to the pending motion, and on December 9, 2021, defendants filed

14  their reply thereto.  (Doc. Nos. 27, 29.)

15                                      **LEGAL STANDARD**

16          Summary judgment is appropriate when the moving party "shows that there is no genuine

17  dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R.

18  Civ. P. 56(a).

19          In summary judgment practice, the moving party "initially bears the burden of proving the

20  absence of a genuine issue of material fact."  *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387

21  (9th Cir. 2010) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  The moving party

22  may accomplish this by "citing to particular parts of materials in the record, including

23  depositions, documents, electronically stored information, affidavits or declarations, stipulations

24  (including those made for purposes of the motion only), admissions, interrogatory answers, or

25  other materials," or by showing that such materials "do not establish the absence or presence of a

26  genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."

27  Fed. R. Civ. P. 56(c)(1)(A), (B).  When the non-moving party bears the burden of proof at trial,

28  "the moving party need only prove that there is an absence of evidence to support the non-moving

1   party's case." *Oracle Corp.*, 627 F.3d at 387 (citing *Celotex*, 477 U.S. at 325); *see also* Fed. R.

2   Civ. P. 56(c)(1)(B).  Indeed, after adequate time for discovery and upon motion, summary

3   judgment should be entered against a party who fails to make a showing sufficient to establish the

4   existence of an element essential to that party's case, and on which that party will bear the burden

5   of proof at trial.  *See Celotex*, 477 U.S. at 322.  "[A] complete failure of proof concerning an

6   essential element of the nonmoving party's case necessarily renders all other facts immaterial."

7   *Id.* at 322–23.  In such a circumstance, summary judgment should be granted, "so long as

8   whatever is before the district court demonstrates that the standard for the entry of summary

9   judgment . . . is satisfied."  *Id.* at 323.

10          If the moving party meets its initial responsibility, the burden then shifts to the opposing

11   party to establish that a genuine issue as to any material fact actually does exist.  *See Matsushita*

12   *Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  In attempting to establish the

13   existence of this factual dispute, the opposing party may not rely upon the allegations or denials

14   of its pleadings but is required to tender evidence of specific facts in the form of affidavits or

15   admissible discovery material in support of its contention that the dispute exists.  *See* Fed. R. Civ.

16   P. 56(c)(1); *Matsushita*, 475 U.S. at 586 n.11; *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773

17   (9th Cir. 2002) ("A trial court can only consider admissible evidence in ruling on a motion for

18   summary judgment.").  The opposing party must demonstrate that the fact in contention is

19   material, i.e., a fact that might affect the outcome of the suit under the governing law, and that the

20   dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the

21   non-moving party.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 250 (1986).

22          In the endeavor to establish the existence of a factual dispute, the opposing party need not

23   establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual

24   dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at

25   trial."  *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

26   Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in

27   order to see whether there is a genuine need for trial.'"  *Matsushita*, 475 U.S. at 587 (citations

28   omitted).

"In evaluating the evidence to determine whether there is a genuine issue of fact," the court draws "all inferences supported by the evidence in favor of the non-moving party." *Walls v. Cent. Contra Costa Transit Auth.*, 653 F.3d 963, 966 (9th Cir. 2011).  It is the opposing party's obligation to produce a factual predicate from which the inference may be drawn.  *See Richards v. Nielsen Freight Lines*, 602 F. Supp. 1224, 1244–45 (E.D. Cal. 1985), *aff'd*, 810 F.2d 898, 902 (9th Cir. 1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts. . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"  *Matsushita*, 475 U.S. at 586–87 (citations omitted).

# ANALYSIS

### A.      Fourth Amendment Excessive Force Claim

Defendants move for summary judgment in their favor as to plaintiff's 42 U.S.C. § 1983 claim that defendant Yepez deployed excessive force against plaintiff by shooting him in violation of the Fourth Amendment.  (Doc. No. 23-1 at 12.)  Defendants so move on the grounds that under the undisputed facts on summary judgment:  (1) defendant Yepez's use of force was objectively reasonable; and (2) defendant Yepez is entitled to judgment in his favor based on qualified immunity.  (*Id.* at 12-18.)

Under § 1983, a private right of action exists against anyone who, "under color of" state law, causes a person to be subjected "to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws . . . ."  42 U.S.C. § 1983.  "Section 1983 does not create substantive rights; it merely serves as the procedural device for enforcing substantive provisions of the Constitution and federal statutes."  *Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991) (citing *Chapman v. Hous. Welfare Rights Org.*, 441 U.S. 600, 617 (1979)).  State officials are entitled to qualified immunity from a § 1983 suit unless "(1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'"  *District of Columbia v. Wesby*, ⸺ U.S. ⸺, 138 S. Ct. 577, 589 (2018) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)).

/////

1              1.        Step One:  Whether a Constitutional Right Was Violated

2              Under the Fourth Amendment, "[t]he right of the people to be secure in their persons,

3    houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and

4    no Warrants shall issue, but upon probable cause."  U.S. Const. amend. IV.  "The Fourth

5    Amendment does not proscribe all state-initiated searches and seizures; it merely proscribes those

6    which are unreasonable."  *Florida v. Jimeno*, 500 U.S. 248, 250 (1991) (citations omitted); *see*

7    *also United States v. Chan-Jimenez*, 125 F.3d 1324, 1326 (9th Cir. 1997) ("For purposes of the

8    Fourth Amendment, a seizure occurs when a law enforcement officer, by means of physical force

9    or show of authority, in some way restrains the liberty of a citizen.").

10             Plaintiff's §1983 claim for excessive use of force in violation of the Fourth Amendment is

11   governed by an "objective reasonableness standard."  *Graham v. Connor*, 490 U.S. 386, 388

12   (1989) (internal quotation marks omitted).  This standard requires a "careful balancing of the

13   nature and quality of the intrusion on the individual's Fourth Amendment interests against the

14   countervailing governmental interests at stake."  *Id.* at 396 (quoting *Tennessee v. Garner*, 471

15   U.S. 1, 8 (1985)).  The calculus "must embody allowance for the fact that police officers are often

16   forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly

17   evolving—about the amount of force that is necessary in a particular situation."  *Id.* at 396–97.

18   Reasonableness in this context is to be judged "from the perspective of a reasonable officer on the

19   scene, rather than with the 20/20 vision of hindsight."  *Id.* at 396.

20             In *Graham*, the Supreme Court listed several factors to be considered in determining the

21   government's interest in the force it used:  (1) "the severity of the crime at issue," (2) "whether

22   the suspect poses an immediate threat to the safety of the officers or others," and (3) "whether

23   [the suspect] is actively resisting arrest or attempting to evade arrest by flight."  *Id.*  The "'most

24   important' factor under *Graham* is whether the suspect posed an "immediate threat to the safety

25   of the officers or others."  *George v. Morris*, 736 F.3d 829, 838 (9th Cir. 2013) (quoting *Bryan v.*

26   *MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010)).  The Ninth Circuit has noted that "[t]hese

27   factors, however, are not exclusive" and that courts should consider "the totality of the

28   circumstances and consider whatever specific factors may be appropriate in a particular case,

whether or not listed in *Graham*." *Bryan*, 630 F.3d at 826 (citation and internal quotation marks omitted); *see also S.B. v. Cnty. of San Diego*, 864 F.3d 1010, 1013 (9th Cir. 2017); *Glenn v. Washington Cnty.*, 673 F.3d 864, 872 (9th Cir. 2011) ("Other relevant factors include the availability of less intrusive alternatives to the force employed, whether proper warnings were given and whether it should have been apparent to officers that the person they used force against was emotionally disturbed."). In short, "[t]he force which [is] applied must be balanced against the need for that force: it is the need for force which is at the heart of the *Graham* factors." *Liston v. Cnty. of Riverside*, 120 F.3d 965, 976 (9th Cir. 1997) (citation omitted); *see also Velazquez v. City of Long Beach,* 793 F.3d 1010, 1025 (9th Cir. 2015); *Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052, 1057 (9th Cir. 2003).

"[T]he reasonableness of force used is ordinarily a question of fact for the jury." *Liston*, 120 F.3d at 976 n.10. Indeed, the Ninth Circuit has repeatedly recognized that "summary judgment should be granted sparingly in excessive force cases." *Gonzalez v. City of Anaheim*, 747 F.3d 789, 795 (9th Cir. 2014); *see also Seidner v. de Vries,* 39 F. 4th 591, 601 (9th Cir. 2022); *Estate of Lopez v. Gelhaus,* 871 F.3d 998, 1006 (9th Cir. 2017); *C.V. ex rel. Villegas v. City of Anaheim*, 823 F.3d 1252, 1255 (9th Cir. 2016); *Green v. City and Cnty. of San Francisco*, 751 F.3d 1039, 1049 (9th Cir. 2014); *Avina v. United States*, 681 F.3d 1127, 1130 (9th Cir. 2012) (citation omitted); *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002) ("Because such balancing nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, we have held on many occasions that summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly."). Thus, while it is true that officers "are often forced to make split-second judgments," "it is equally true that even where some force is justified, the amount actually used may be excessive." *Santos*, 287 F.3d at 853 (citations omitted). In the final analysis, "[f]orce is excessive when it is greater than is reasonable under the circumstances." *Id.* at 854 (citing *Graham*, 490 U.S. at 395).

Here, with respect to the first *Graham* factor—the severity of the crime at issue—it is undisputed on summary judgment that plaintiff's initial "crime" was driving over the speed limit by approximately 15 miles per hour, going 80 MPH in a zone where the speed limit was 65 MPH.

1   Along with violating the speed limit, defendants also argue that plaintiff drove recklessly.  (Doc.

2   No. 23-1 at 13, 15.)  The nature of these traffic violations, however, provides little independent

3   basis for defendant Yepez's use of force.  *See Bryan*, 630 F.3d at 828 ("Traffic violations

4   generally will not support the use of a significant level of force."); *Wiley v. Washington State*

5   *Patrol*, No. 05-cv-1948-RSM, 2007 WL 1655273, at *7 (W.D. Wash. June 7, 2007) (stating that

6   the victim allegedly speeding and driving recklessly provided "little, if any, basis for the troopers'

7   use of physical force").

8          In addition, defendants point out that as a result of the events of March 15, 2018, plaintiff

9   later entered pleas of no contest in the Stanislaus County Superior Court to the felony offense of

10  possessing a loaded firearm in a public place in violation of California Penal Code § 25850(c)(6),

11  as well as to the misdemeanor offense of evading a police officer in violation of Penal Code §

12  2800.1(a).  (Doc. No. 23-2 at 5.)  Regarding the former offense, the Ninth Circuit has recognized

13  that "[t]he mere fact that a suspect possesses a weapon does not justify deadly force," though

14  "threatening an officer with a weapon does . . . ."  *Hayes v. Cnty. of San Diego*, 736 F.3d 1223,

15  1233, 1234 (9th Cir. 2013) (citing cases); *see also S.R. Nehad v. Browder*, 929 F.3d 1125, 1134

16  (9th Cir. 2019) ("Indeed, we have often denied summary judgment in excessive force cases to

17  police officers who use force against armed individuals.") (citing cases).  As plaintiff argues, the

18  weapon possession offense to which he pled no contest provides that "a person is guilty of

19  carrying a loaded firearm when the person carries a loaded firearm on the person or in a vehicle

20  while in any public place . . . ."  (Doc. No. 27 at 17) (citing Cal. Pen. Code § 25850(A)).  Thus, as

21  plaintiff notes, it was the mere possession of a loaded gun in the vehicle that provided a sufficient

22  factual basis for his no contest plea to that offense.  (*See id.*; *see also* Doc. No. 23-5 at 17 [the

23  deputy district attorney provided the factual basis for Hurtado's plea to California Penal Code §

24  25850 as follows:  "the officer was able to locate a loaded operable pistol in the vehicle at the

25  time of the stop"].)

26          Plaintiff's misdemeanor offense was for evading a police officer by not pulling his vehicle

27  over to the side of the road before the crash occurred when Officer Randazzo activated his

28  emergency lights and siren.  (*See* Doc. No. 23-5 at 16–17.)  The Ninth Circuit has noted that

"misdemeanors are relatively minor and will generally not support the deployment of significant force." *Bryan*, 630 F.3d at 829 n.12.

Notably, defendant Yepez testified at his deposition that plaintiff was not committing any crime at the time he was shot.  (Doc. No. 27-3 at 166.)  Considering the undisputed evidence on summary judgment that plaintiff was not actively resisting arrest or attempting to evade arrest by flight or committing any other crime when he was shot, the court cannot conclude that the government had a substantial interest in using potentially deadly force[4] to arrest him for a felony violation of possession of a loaded gun in his car or for a misdemeanor violation.  For these reasons, the first *Graham* factor weighs in favor of plaintiff.

As to the third *Graham* factor, the undisputed evidence before the court establishes that plaintiff was not actively resisting arrest or attempting to evade arrest by way of flight at the time he was shot.  Consideration of this factor thus also weighs in plaintiff's favor.

The "most important" factor under *Graham*, of course, is whether plaintiff posed an "immediate threat to the safety of the officers or others."  *Bryan*, 630 F.3d at 826.  While defendant Yepez stated in his declaration that he shot plaintiff because he feared for the safety of himself and his partner, "such a statement 'is not enough; there must be objective factors to justify such a concern.'"  *George*, 736 F.3d at 838 (citing *Bryan*, 630 F.3d at 826).  In this case, there are clearly triable issues of fact as to whether plaintiff was reaching for his gun and whether he was on his stomach or was in a crouching position when defendant Yepez shot him.  In determining whether defendant Yepez is entitled to qualified immunity on summary judgment, because plaintiff's version of the events is not "blatantly contradicted by the record," the court must credit plaintiff's deposition testimony that he did not reach for the gun and that he was on his belly when defendant Yepez shot him from behind.  *See Gomez v. Fachko*, No. 19-cv-05266-LHK, 2021 WL 1721067, at *9 (N.D. Cal. Apr. 30, 2021) ("In weighing whether an officer is entitled to qualified immunity at summary judgment, the Court 'must construe the facts in the

---

[4] "Some uses of force can be quantified categorically.  The best example is shooting a firearm, which by definition is 'deadly force':  force that 'creates a substantial risk of causing death or serious bodily injury.'"  *Seidner v. de Vries*, 39 F.4th 591, 596 (9th Cir. 2022) (quoting *Smith v. City of Hemet*, 394 F.3d 689, 693 (9th Cir. 2005)).

1   light most favorable to the plaintiff.'  Specifically, as the Ninth Circuit has explained, the Court

2   must credit plaintiff's version of events unless it is 'blatantly contradicted by the record, so that

3   no reasonable jury could believe it.'") (quoting *Orn v. City of Tacoma*, 949 F.3d 1167, 1171 (9th

4   Cir. 2020)).  Based on the evidence presented by plaintiff, a reasonable jury could conclude that

5   he did not pose an "immediate threat to the safety of the officers or others," *George*, 736 F.3d at

6   838 (internal quotation marks omitted), and that it was therefore objectively unreasonable for

7   defendant Yepez to employ deadly force.

8          Finally, it is undisputed that defendant Yepez provided no verbal warnings to plaintiff

9   before shooting him.  This is significant.  The Ninth Circuit has recognized "that an officer must

10   give a warning before using deadly force 'whenever practicable.'"  *Gonzalez*, 747 F.3d at 794

11   (citing *Harris v. Roderick*, 126 F.3d 1189, 1201 (9th Cir. 1997)); *see also S.R. Nehad,* 929 F.3d at

12   1137 ("The seemingly obvious principle that police should, if possible, give warnings prior to

13   using force is not novel, and is well known to law enforcement officers."); *Deorle v. Rutherford*,

14   272 F.3d 1272, 1284 (9th Cir. 2001) ("Appropriate warnings comport with actual police practice .

15   . . [and] such warnings should be given, when feasible, if the use of force may result in serious

16   injury.").  Defendants argue that it was not feasible for defendant Yepez to issue a warning in this

17   situation (Doc. Nos. 23-1 at 15; 29 at 2), but it remains unclear based upon the evidence before

18   the court on summary judgment whether that was true.  Plaintiff contends that it was feasible to

19   give a warning, arguing that in the time defendant Yepez took to fire, he could have instructed

20   plaintiff "don't touch that gun."  (Doc. No. 27 at 18.)  "A jury could consider [defendant Yepez's]

21   failure to provide such a warning as evidence of objective unreasonableness."  *S.R. Nehad*, 929

22   F.3d at 1138.

23          Viewing the evidence presented on summary judgment in the light most favorable to

24   plaintiff, the court concludes that a reasonable jury could find defendant Yepez's use of force to

25   be objectively unreasonable and thus in violation plaintiff's right under the Fourth Amendment to

26   be free from the excessive use of force.[5]

27   _____

28   [5]  Therefore, defendant Yepez is also not entitled to summary judgment in his favor as to
     plaintiff's excessive use of force claim based upon defendants' contention that Officer Yepez's

1       2.      <u>Step Two:  Whether the Right Was Clearly Established</u>

2            "Under the second prong of the qualified immunity test, we ask whether the alleged

3 violation of [plaintiff's] Fourth Amendment right against excessive force was clearly established

4 at the time of the officer's alleged misconduct." *C.V. ex rel. Villegas*, 823 F.3d at 1257 (internal

5 quotation marks omitted); *see also Orn*, 949 F.3d at 178.  If a violation of plaintiff's Fourth

6 Amendment right against excessive force in this context was not clearly established at the time of

7 the encounter, defendant Yepez is entitled to judgment in his favor on qualified immunity

8 grounds. *C.V. ex rel. Villegas*, 823 F.3d at 1257.   "A Government official's conduct violates

9 clearly established law when, at the time of the challenged conduct, '[t]he contours of [a] right

10 [are] sufficiently clear' that every 'reasonable official would [have understood] that what he is

11 doing violates that right.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011*)* (alteration in original)

12 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)); *see also Wesby*, 138 S. Ct. at 589.

13 "We do not require a case directly on point, but existing precedent must have placed the statutory

14 or constitutional question beyond debate." *Wesby,* 138 S. Ct. at 590 (quoting *Ashcroft,* 563 U.S.

15 at 741).

16            It is not appropriate for courts to define clearly established law at a high level of

17 generality; instead, the inquiry "must be undertaken in light of the specific context of the case, not

18 as a broad general proposition." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (citation omitted); *see*

19 *also Wesby*, 138 S. Ct. at 590.  "Such specificity is especially important in the Fourth Amendment

20 context, where . . . [i]t is sometimes difficult for an officer to determine how the relevant legal

21 doctrine, here excessive force, will apply to the factual situation the officer confronts." *Mullenix*,

22 577 U.S. at 12 (internal quotation marks and citation omitted).

23            In his opposition to the pending motion, plaintiff identifies several prior court decisions

24 that he contends establish the relevant and clearly established law, including the Ninth Circuit's

25 decision in *Curnow ex rel. Curnow v. Ridgecrest Police*, 952 F.2d 321 (9th Cir. 1991).  (Doc. No.

26 27 at 20–22.)  In *Curnow*, the police broke down a suspect's front door because the officers

27

28    use of force was objectively reasonable.

believed the suspect had injured a woman inside.  952 F.2d at 323.  According to the witness's
statement submitted in support of the plaintiff's opposition to the motion for summary judgment
brought in that case—which contradicted the affidavits submitted by the police officers—when
the officers entered the house, the suspect did not reach for his gun before the police shot him.  *Id.*
In addition, the witness perceived the suspect as having been shot in the back by the first shot
fired by officers.  *Id.*  The Ninth Circuit held that when viewing that evidence in the light most
favorable to the plaintiff, the "police officers could not reasonably have believed the use of
deadly force was lawful because [the victim] did not point the gun at the officers and apparently
was not facing them when they shot him the first time."  *Id.* at 325.

The court agrees with plaintiff that the Ninth Circuit's 1991 decision in *Curnow* clearly
established the legal principle that is relevant and applicable here:  officers cannot use deadly
force against a suspect who is not facing them and does not threaten them with a weapon, even if
a weapon is within the suspect's reach at the time.  In fact, the Ninth Circuit has subsequently
specifically recognized that the 1991 decision in *Curnow* gave "'fair notice' that the use of deadly
force is unreasonable where the victim does not directly threaten the officer with the gun."  *Estate
of Lopez ex rel. Lopez v. Gelhaus*, 871 F.3d 998, 1020 (9th Cir. 2017); *see also id.* at 1010, 1021
(affirming the district court's denial of the defendants' motion for summary judgment on
qualified immunity grounds where the suspect had a gun in his hand with the barrel pointing
towards the ground); *George*, 736 F.3d at 838 (affirming the district court's denial of the
defendants' motion for summary judgment on qualified immunity grounds where the suspect held
a gun with the barrel pointed downward, without pointing it at the officers or engaging in
threatening behavior); *Banks v. Mortimer*, 620 F. Supp. 3d 902, 929–32 (N.D. Cal. 2022)
(denying summary judgment on qualified immunity grounds where there was a genuine dispute as
to whether the plaintiff was armed when he was shot, finding that the prior decisions in *Curnow*
and *Gelhaus* clearly established that officers cannot use deadly force even when a weapon is
within suspect's reach if the suspect is not facing or threatening officers).

In light of these decisions, the granting of summary judgment in defendant Yepez's favor
is not appropriate here because his entitlement to qualified immunity depends on disputed factual

1   issues which must be resolved by the trier of fact.  *See Gelhaus*, 871 F.3d at 1021 ("Because

2   [officer's] entitlement to qualified immunity ultimately depends on disputed factual issues,

3   summary judgment is not presently appropriate.").  Defendants' motion for summary judgment

4   on plaintiff's Fourth Amendment claim will therefore be denied.

5   **B.      Fourteenth Amendment Claim**

6          Defendant Yepez next moves for summary judgment in his favor on plaintiff's claim that

7   he violated plaintiff's substantive due process rights under the Fourteenth Amendment.  (Doc.

8   No. 23-1 at 18.)  In his SAC, plaintiff attempts to assert both a Fourth Amendment claim and a

9   substantive due process claim under the Fourteenth Amendment in connection with the alleged

10  excessive force used by defendant Yepez.  (Doc. No. 9 at 9–13.)  With respect to his Fourteenth

11  Amendment claim, plaintiff asserts that defendant Yepez's conduct "shocked the conscience and

12  interfered with the life, safety and health" of plaintiff, in that defendant "had time to deliberate

13  and then used excessive force that was deliberately indifferent to the constitutional rights of the

14  [p]laintiff and/or shocks the conscience and with a purpose to harm unrelated to any legitimate

15  law enforcement objective in violation of 42 U.S.C. §1983[.]"  (*Id.* at ¶ 39.)

16         To succeed on their Fourteenth Amendment claim, plaintiff must meet a higher standard

17  than the "objective reasonableness" standard applicable to his Fourth Amendment claim.  *Porter

18  v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008).  Substantive due process is violated when

19  government conduct "can properly be characterized as arbitrary, or conscience shocking."

20  *Collins v. City of Harker Heights*, 503 U.S. 115, 128 (1992).  The Supreme Court has been

21  reluctant to expand the concept of substantive due process (*id.* at 125), holding that "[w]here a

22  particular Amendment provides an explicit textual source of constitutional protection against a

23  particular sort of government behavior, that Amendment, not the more generalized notion of

24  substantive due process, must be the guide for analyzing these claims."  *Albright v. Oliver*, 510

25  U.S. 266, 273 (1994) (citing *Graham*, 490 U.S. at 395) (internal quotation marks omitted); *see

26  also Armendariz v. Penman*, 75 F.3d 1311, 1328 (9th Cir. 1996) (holding that the defendants were

27  entitled to summary judgment on the plaintiff's substantive due process claims where

28  "substantive due process provides the plaintiffs no additional relief"), *overruled in part on other*

16

1    *grounds as recognized in Crown Point Dev., Inc. v. City of Sun Valley*, 506 F.3d 851, 852 (9th

2    Cir. 2007).  Consistent with that precedent, "*all* claims that law enforcement officers have used

3    excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure'

4    of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness'

5    standard, rather than under a 'substantive due process' approach." *Graham*, 490 U.S. at 395; *see*

6    *also Peck v. Montoya*, 51 F.4th 877, 892 (9th Cir. 2022).

7         In his opposition to the pending motion, plaintiff argues that a cause of action under the

8    Fourteenth Amendment exists when the police kill a person without justification.  (Doc. No. 27 at

9    23.)  Plaintiff's argument in this regard, however, misses the mark.  Plaintiff cites to two

10   decisions in which the Ninth Circuit held that parents have a constitutionally protected liberty

11   interest in the companionship of their child and thus have a cognizable cause of action under the

12   Fourteenth Amendment when the police kill their child without legal justification.  (*Id.*) (citing

13   *Chaudhry v. City of Los Angeles*, 751 F.3d 1096, 1106 (9th Cir. 2014) and *Porter*, 546 F.3d at

14   1136).  Unlike those cases, here, plaintiff was the one shot by the police.  Plaintiff in this case is

15   not a surviving family member claiming that his liberty interest in familial association was denied

16   by the police killing his family member without justification.  *See Peck*, 51 F.4th at 892 ("We

17   have construed the [Supreme] Court's statement in *Graham* to limit only claims brought by 'the

18   person who claims excessive force was directed at him,' leaving open the possibility of

19   substantive due process claims by a parent or child who claims 'loss of the companionship and

20   society' of the decedent.") (quoting *Curnow*, 952 F.2d at 325).

21        Because plaintiff asserts in this action that "law enforcement officers have used excessive

22   force . . . in the course of . . . [a] 'seizure' of a free citizen," his Fourteenth Amendment claim is

23   not cognizable.  *Graham*, 490 U.S. at 395.  Accordingly, the court will grant defendants' motion

24   for summary judgment in their favor with respect to plaintiff's Fourteenth Amendment claim.

25   **C.    State Law Claims Against Defendant Yepez**

26        In his SAC, plaintiff brings state law battery and negligence claims against defendant

27   Yepez based on the same facts alleged in support of his Fourth Amendment claim asserted under

28   § 1983.  (Doc. No. 9 at 13–17.)  "Courts generally analyze these claims under the same rubric as

17

§ 1983 claims based on the Fourth Amendment." *Banks*, 620 F. Supp. 3d at 935. Accordingly, when there are triable issues of fact as to the plaintiff's Fourth Amendment claim, there are likewise triable issues of fact as to the plaintiff's state law negligence and battery claims stemming from the same facts. *See id.* ("Because the Court has already found that triable issues of fact exist as to whether Officer Mortimer violated Mr. Banks's Fourth Amendment rights, it reaches the same conclusion on the state law claims [for false arrest, battery, and negligence]."); *Diaz v. Cnty. of Ventura*, 512 F. Supp. 3d 1030, 1048 (C.D. Cal. 2021) ("[B]ecause the Court denies the MSJ as to the Fourth Amendment claim, the Court also DENIES the MSJ as to the negligence and battery claims."); *Orr v. California Highway Patrol*, No. 2:14-cv-585-WBS-EFB, 2015 WL 848553, at *15 (E.D. Cal. Feb. 26, 2015) ("Because genuine issues of material fact remain as to the reasonableness of the arrest, the court will deny both parties' motions for summary judgment with respect to plaintiff's state-law claims for assault, battery, false arrest, and negligence.").

Defendants next contend that they are immune from liability under the California Government Code § 820.2 and California Penal Code § 835a and are therefore entitled to summary judgment on plaintiff's state law claims. (Doc. No. 23-1 at 23.) California Government Code § 820.2, part of the California Tort Claims Act, states: "Except as otherwise provided by statute, a public employee is not liable for an injury resulting from his act or omission where the act or omission was the result of the exercise of the discretion vested in him, whether or not such discretion be abused." Cal. Gov't Code § 820.2. However, § 820.2 "does not confer immunity on peace officers for discretionary acts involving unreasonable use of force." *Megargee v. Wittman*, 550 F. Supp. 2d 1190, 1208 (E.D. Cal. 2008) (citing *Scruggs v. Haynes*, 252 Cal. App. 2d 256, 266 (1967)); *see also J.A. v. Madera Cnty.*, No. 1:21-cv-00252-ADA-EPG, 2023 WL 425819, at *6 (E.D. Cal. Jan. 26, 2023) ("[S]ection 820.2 'applies to police officers' discretionary decisions made during arrests. But it has long been established that this provision does not apply to officers who use unreasonable force in making an arrest.'") (quoting *Blankenhorn v. City of Orange*, 485 F.3d 463, 487 (9th Cir. 2007)).

Section 835 provides that "[t]he person arrested may be subjected to such restraint as is

reasonable for his arrest and detention." Cal. Pen. Code § 835.  Section 835a states that an officer

may use objectively reasonable force to effect arrest, prevent escape, or overcome resistance.  *Id.*

§ 835a.  As plaintiff argues, the operative language of the provision is clear:  the privilege applies

only to the use of "reasonable" force, not to the use of "unreasonable" force.  (Doc. No. 27 at 27.)

Because the court has already determined that genuine issues of material fact remain to be

resolved at trial regarding the reasonableness of defendant Yepez's use of force, he is not entitled

to summary judgment in his favor under §§ 835 and 835a.  *See Orr*, 2015 WL 848553, at *14

(finding that the defendants were not entitled to immunity under §§ 835 and 835a at the summary

judgment stage because there were genuine issues of material fact as to the reasonableness of the

officers' use of force).

Thus, defendants' motion for summary judgment with respect to plaintiff's state law

claims for battery and negligence against defendant Yepez, predicated on the same facts as

plaintiff's Fourth Amendment claim brought pursuant to § 1983, will be denied.

**D.     Negligence Claim Against Defendant CHP**

Defendants also move for summary judgment in their favor as to plaintiff's state-law

negligence claim against defendant CHP.  (Doc. No. 23-1 at 20.)  In his SAC, plaintiff alleges

two negligence theories as to defendant CHP.  The first is a theory of direct liability, that

defendant CHP is liable for its own negligence in failing to train and supervise and failing to

ensure an adequate number of employees with appropriate training were available to meet the

needs and protect the rights of plaintiff.  (Doc. No. 9 at 15.)  The second is a theory of vicarious

liability, alleging that defendant CHP is vicariously liable for defendant Yepez's negligent

conduct.  (*Id.* at 16.)  In their pending motion for summary judgment, defendants argue that

plaintiff's negligence claim against defendant CHP fails as a matter of law because a cause of

action for direct liability for negligent hiring, supervision, and training cannot be maintained

against a public entity under California law.  (Doc. No. 23-1 at 21.)

"In California, a governmental entity can only be sued in tort pursuant to an authorizing

statute or enactment."  *Van Ort v. Est. of Stanewich*, 92 F.3d 831, 840 (9th Cir. 1996) (citing

*Lopez v. S. Cal. Rapid Transit Dist.*, 40 Cal. 3d 780, 785 n.2 (1985); *Searcy v. Hemet Unified Sch.*

*Dist.*, 177 Cal. App. 3d 792, 798 (1986)).  California law is clear that direct liability of a public

entity "must be based on a specific statute declaring [the public entity] to be liable, or at least

creating some specific duty of care[.]"  *de Villers v. Cnty. of San Diego*, 156 Cal. App. 4th 238,

255 (2007) (citation omitted).  "[A] direct claim against a governmental entity asserting negligent

hiring and supervision, when not grounded in the breach of a statutorily imposed duty owed by

the entity to the injured party, may not be maintained."  *Id.* at 255–56; *see also Sandoval ex rel.

B.U. v. City of Nat'l City*, No. 22-cv-1657-GPC-AGS, 2023 WL 3295590, at *12 (S.D. Cal. May

5, 2023).

      To the extent that the plaintiff is alleging a theory of direct liability against defendant CHP

for negligent hiring, supervision, or ensuring an adequate number of trained employees, plaintiff

has not identified a statute providing for defendants' direct liability.  *See Heflin v. Cnty. of Los

Angeles*, 438 F. App'x 596, 597 (9th Cir. 2011)[6] (affirming the dismissal of a claim against a

California county, stating that plaintiff "points to no statutory language supporting a negligent

hiring or supervision claim against a public entity").  Furthermore, "California courts have

repeatedly held that there is no statutory basis for direct claims against a public entity for

negligent hiring and supervision practices."  *Shoval v. Sobzak*, No. 09-cv-01348-H-JMA, 2009

WL 2780155, at *4 (S.D. Cal. Aug. 31, 2009) (collecting cases).

      Defendants also appear to seek summary judgment in their favor on plaintiff's entire

negligence claim against defendant CHP.  (Doc. No. 23-1 at 21.)  It is not entirely clear if

defendants are moving for summary judgment in their favor as to plaintiff's vicarious liability

theory of negligence.  In any event, the court finds that defendant CHP has not established its

entitlement to summary judgment in its favor as to that claim.  In his SAC, plaintiff asserts his

negligence claim based upon defendant CHP's vicarious liability pursuant to California

Government Code § 815.2 (*see* Doc. No. 9 at 16), which states that "[a] public entity is liable for

injury proximately caused by an act or omission of an employee of the public entity within the

scope of his employment if the act or omission would . . . have given rise to a cause of action

---

[6] Citation to this unpublished Ninth Circuit opinion is appropriate pursuant to Ninth Circuit Rule 36-3(b).

against that employee[.]"  Cal. Gov't Code § 815.2(a); *see also Mary M. v. City of Los Angeles*, 54 Cal. 3d 202, 215 (1991) ("[A] governmental entity can be held vicariously liable when a police officer acting in the course and scope of employment uses excessive force or engages in assaultive conduct.").  Due to the disputed issues of material fact surrounding the reasonableness of defendant Yepez's actions taken in the course of his duties, summary judgment in favor of defendant CHP as to plaintiff's vicarious liability theory of negligence is also not appropriate.

Accordingly, the court will grant defendants' motion for summary judgment in their favor with respect to plaintiff's direct negligence claim against defendant CHP for negligent supervision, hiring, and ensuring adequate numbers of trained employees.  However, plaintiff's negligence claim against defendant CHP based upon a theory of vicarious liability remains.

**CONCLUSION**

For the reasons explained above,

1.     Defendants' motion for summary judgment (Doc. No. 23) is granted in part and denied in part as follows:

     a.     Defendants' motion for summary judgment as to plaintiff's Fourth Amendment claim is denied;

     b.     Defendants' motion for summary judgement as to plaintiffs' Fourteenth Amendment claim is granted;

     c.     Defendants' motion for summary judgment as to plaintiff's battery claim is denied;

     d.     Defendants' motion for summary judgment as to plaintiff's negligence claim against defendant Yepez is denied; and

     e.     Defendants' motion for summary judgment as to plaintiff's negligence claim against defendant CHP is granted in part, as follows:

          i.     Defendants' motion for summary judgment with respect to plaintiff's negligence claim against defendant CHP for negligent hiring, supervision, and ensuring an adequate number of trained employees is granted;

ii.     Defendants' motion for summary judgment with respect to

plaintiff's negligence claim against defendant CHP based upon a

theory of its vicarious liability is denied; and

2.     Consistent with the undersigned's scheduling practices, the court now sets a Final

Pretrial Conference on August 22, 2023 at 1:30 p.m. before District Judge Dale A.

Drozd by Zoom and a Jury Trial on October 23, 2023 at 9:00 a.m. before Judge

Drozd in Courtroom 4.[7]  The parties are referred to Judge Drozd's Standing Order

(Doc. No. 36) for the requirements of the joint pretrial statement.

IT IS SO ORDERED.

Dated:   **June 15, 2023**

_____

UNITED STATES DISTRICT JUDGE

---

[7]  Should the Pretrial and Trial dates set by this order be inconvenient for the parties, they are instructed to consult with Judge Drozd's Courtroom Deputy Pete Buzo (PBuzo@caed.uscourts.gov) and thereafter submit a proposed stipulation and order resetting dates that are convenient for the parties, their counsel, and the court.