1   ROB BONTA, State Bar No. 202668
    Attorney General of California
2   IVETA OVSEPYAN, State Bar No. 279218
    Supervising Deputy Attorney General
3   LEEANN E. WHITMORE, State Bar No. 214870
    Deputy Attorney General
4   JOHN C. BRIDGES, State Bar No. 248553
    Deputy Attorney General
5     1300 I Street, Suite 125
      P.O. Box 944255
6     Sacramento, CA 94244-2550
      Telephone: (916) 210-7515
7     Telephone: (916) 210-7529
      Fax: (916) 322-8288
8     E-mail: LeeAnn.Whitmore@doj.ca.gov
      E-mail: John.Bridges@doj.ca.gov
9   *Attorneys for Defendants State of California,
    acting by and through the California Highway*
10  *Patrol and Edgardo Yepez*

11

12              IN THE UNITED STATES DISTRICT COURT

13            FOR THE EASTERN DISTRICT OF CALIFORNIA

14

15

16  **FRANCISCO HURTADO, AN**          Case No.: 2:19-CV-02343-DAD-AC
    **INDIVIDUAL,**
17                                     **DEFENDANTS' TRIAL BRIEF**

18                         Plaintiff,

19              v.                     Trial Date:   March 11, 2024
                                       Time:         9:00 a.m.
20  **STATE OF CALIFORNIA;**           Courtroom:    4
    **CALIFORNIA HIGHWAY PATROL;**     Judge:        Hon. Dale A. Drozd
21  **EDGARDO YEPEZ AKA EDGARDO**
    **LOPEZ; AND DOES 1 THROUGH 100,**
22  **INCLUSIVE,**

23

24                        Defendants.
                                       Trial Date:   March 11, 2024
25                                     Action Filed:  April 2, 2019

26

27

28

                                   1

1    Pursuant to the Court's Final Pre-Trial Order, ECF No. 55 and Local Rule 285, Defendants,

2    State of California, by and through the California Highway Patrol (CHP), and Edgardo Yepez

3    submit the following trial brief.

4                                  **SHORT STATEMENT OF FACTS**

5        On March 15, 2018, CHP Officers Randazzo and Yepez were on duty in a marked CHP

6    vehicle performing traffic enforcement. At approximately 10:50 p.m., as they were entering

7    Highway 99 southbound, Officer Randazzo noticed an SUV in the number one lane speeding.

8        Officer Randazzo paced the vehicle at approximately 80 miles per hour (MPH) even though

9    the speed limit was 65 MPH.  Officer Randazzo activated the emergency lights and sirens to

10   initiate a traffic stop. The vehicle, driven by plaintiff, did not pull over, appeared to accelerate

11   and swerved between two lanes, almost hitting  another vehicle. After approximately 15 seconds,

12   Officer Randazzo discontinued the attempted stop because of public safety concerns based on the

13   manner that plaintiff was driving.

14       Plaintiff did not have a driver's license at the time of the incident. Additionally, he had a

15   loaded gun in his front cup holder. He had also used cocaine and drank beers earlier in the

16   evening. The officers were not aware of these facts at the time they initiated the traffic stop,

17   however, Officer Yepez believed that the way plaintiff was driving could be an indication of

18   driver impairment.

19       Plaintiff testified that he did not know that he was being pulled over, although he saw the

20   patrol vehicle's lights and sirens activated. He took the Keyes Road off ramp. Despite not

21   believing he was being pulled over, he testified that he looked back and no longer saw police

22   lights behind him. When he looked back, he noticed a stop sign on the top of the off ramp. He

23   attempted to brake, but crashed his vehicle through the guardrail. It went down a steep

24   embankment, crashed through a fence and came to rest upside down.

25       Officers Randazzo and Yepez took the Keyes Road exit to see if they could obtain

26   plaintiff's license plate to report a "Be on the Lookout Alert" to dispatch. As they approached the

27   top of the exit, they observed the damaged guardrail and assumed that plaintiff had crashed his

28   vehicle and was injured.  Officer Randazzo told Officer Yepez to call for the fire department and

                                                    2

ambulance and proceeded to walk down the embankment. Officer Yepez requested dispatch notify fire and ambulance and proceeded down the embankment to determine if they could render assistance. The area was dark, but the officers had their flashlights in their hands which provided some lighting.

The patrol vehicle's Mobile Video Audio Recording System (MVARS) recorded the attempted enforcement stop and continued to record at the top of the embankment. Audio recordings from the officers' microphones can be heard when they are on the bottom of the embankment.

Officer Randazzo initially could not see anyone in the vehicle. He walked to the front of the vehicle and observed plaintiff's torso. He gave several commands including "show your hands" and "don't move."

Officer Randazzo walked toward the driver's side door and shined his flashlight into the vehicle. He observed plaintiff's torso, but could not see plaintiff's head or legs. Officer Randazzo was about two to four feet from the driver's side door. Plaintiff appeared to be moving his torso from left to right as if he was trying to get out of the vehicle. After about twenty seconds, Officer Randazzo's flashlight beam revealed a gun that was on the right side of plaintiff's torso. The gun was about a foot away from plaintiff. When he saw the gun, he again commanded plaintiff not to move, yelled "gun" to alert his partner of the weapon, and moved backward to take cover, because he was concerned for his safety. When he started moving backwards, he looked down at the ground so he would not trip over the large weeds in the area.

Officer Yepez initially went to the passenger side of the SUV, but could not see inside because of the damage to that area of the vehicle. He then went to the rear of the SUV to see if he could pull plaintiff out through the opened rear window. He crouched down and shined his flashlight into the SUV but did not see plaintiff and stood up. When he heard Officer Randazzo yell "gun," Officer Yepez again looked down and saw plaintiff crouched, in a squat position, on the roof of the overturned SUV in the center area close to the driver's seat, facing toward the driver's side door of the SUV. From his vantage point, Officer Yepez could see plaintiff's right shoulder, right arm, right hand, buttocks, knee and both feet. He saw the gun next to plaintiff's

3

feet on the right side of plaintiff's right foot. Approximately a second and half later, he saw plaintiff reach for and appear to grab the gun. Officer Yepez then fired four rounds toward plaintiff because he feared for the safety of Officer Randazzo.

Plaintiff claims he was in and out of consciousness at the scene and does not recall hearing any commands. There is no medical evidence to support this. Additionally, plaintiff claims he did not reach for the gun. Plaintiff's selective recollection of events is suspect. He has told numerous medical providers that he does not recall the incident. Additionally, it is irrelevant as Officer Yepez's perception of plaintiff's movement is the critical inquiry for liability analysis. The gun was located in the SUV approximately a foot from where the officers observed plaintiff. The gun was not moved from the vehicle.

Plaintiff was struck in the right ankle, buttocks and right thigh. Officer Randazzo yelled "stop fire" because he did not want to be in a cross-fire situation and did not know where Officer Yepez was firing from. Officer Yepez was aware of where Officer Randazzo was at the time he fired his weapon and did not believe there was a danger of cross-fire because he was firing directly at plaintiff. Prior to breaking the window to extricate plaintiff, Officer Randazzo issued additional commands for plaintiff not to move. Officer Yepez kept his gun drawn until plaintiff was out of the vehicle and handcuffed.

The Stanislaus County District Attorney's office and California Highway Patrol found Officer Yepez's use of force was within policy. Plaintiff plead no contest to a felony possession of a loaded firearm and a misdemeanor charge of evading an officer. Plaintiff's plea precludes him from arguing that he did not have a firearm and was not evading the officers when they attempted to pull him over.

## POINTS OF LAW

### I.    FOURTH AMENDMENT EXCESSIVE FORCE CLAIM

A claim that a police officer used excessive force is analyzed under the framework of the Fourth Amendment objective reasonableness standard articulated by the United States Supreme Court. *Graham v. Connor*, 490 U.S. 386, 396 (1989). In determining reasonableness, the court

4

must pay careful attention to the facts and circumstances in the particular case, the severity of the crime at issue, whether the suspect posed an immediate threat to the safety of officers, and whether the suspect is actively resisting or attempting to evade arrest by flight. *Id.* at 396. The use of force must be viewed from the reasonable officer on the scene rather than with 20/20 vision of hindsight. *Id.* When an officer has probable cause to believe that the suspect poses an immediate threat of serious harm, either to the officer or to others, it is not constitutionally, unreasonable to prevent escape by using deadly force. *Tennessee v. Garner,* 471 U.S. 1, 11 (1985). The Fourth Amendment does not impose liability for negligent decisions regarding the amount of force used to take control of a situation; only objectively unreasonable force constitutes a violation. *Billington v. Smith,* 292 F.3d 1177, 1188-1190 (9th Cir. 2002).

(1) Severity of Crimes and Attempt to Evade: Officer Yepez observed plaintiff speeding and plaintiff failed to pull over after Officer Randazzo activated the emergency lights and sirens. Officer Yepez thought plaintiff's speeding and erratic driving was because he was likely impaired. At the time of the shooting, the officers were checking on plaintiff following his traffic accident. Officer Randazzo issued several commands to plaintiff including "don't move"and show me your hands. While the officers were responding to a traffic accident at that time, plaintiff's failure to pull over and follow commands, required the officers to approach the vehicle with additional caution as plaintiff had not been compliant with their earlier attempts to pull him over.

(2) Rapidly Evolving Situation and Immediate Threat: Officers Randazzo and Yepez initially went down the embankment to provide aid to plaintiff following his accident. The situation changed rapidly when Officer Randazzo saw the gun and took cover. Officer Yepez was at the rear of the SUV and saw plaintiff reach for and appear to grab the gun. He believed that plaintiff posed an immediate threat to Officer Randazzo, who was close to the driver's side door.

## II.   COMMON ELEMENT OF REASONABLENESS

Plaintiff's Fourth Amendment, state law battery and negligence claims all include the common element of objective reasonableness. *Graham v. Conner,* 490 U.S. 386, 397 (1989)

5

1   (holding use of force must be judged by objective reasonableness inquiry and setting out factors);

2   *Brown v. Ransweiler*, 171 Cal.App.4th 516, 527 (2009) ("A state law battery claim is a

3   counterpart to a federal claim of excessive use of force. In both, a plaintiff must prove that the

4   peace officer's use of force was unreasonable."), *Hayes v. Cty. of San Diego*, 57 Cal.4th 622, 639

5   (2013) (holding negligent use of force by a peace officer is judged by a reasonable standard and

6   repeatedly quoting *Graham*.) The reasonableness of a particular use of force must be evaluated

7   from the perspective of a reasonable officer on the scene without the benefit of hindsight.

8   *Graham*, 490 U.S. 386, 396.

9       Additionally, as far as the negligence cause of action, As long as an officer's conduct falls

10  within the range of conduct that is reasonable under the circumstances, there no requirement that

11  he or she choose the 'most reasonable' action or the conduct that is lease likely to cause harm and

12  at the same time the most likely to result in successful apprehension of a violent suspect, in order

13  to avoid liability for negligence." *Hayes,* 57 Cal.4th at 632, quoting *Brown*, 171 Cal.App.4th at

14  537-538.

15  **III.   QUALIFIED IMMUNITY**

16      Defendants also maintain that Officer Yepez is entitled to qualified immunity. An analysis

17  of qualified immunity focuses closely on an analysis of existing precedent.  While it "do[es] not

18  require a case directly on point…existing precedent must have placed the statutory of

19  constitutional question beyond debate, such that 'every' reasonable official – not just 'a'

20  reasonable official – would have understood that he was violating clearly established right."

21  *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).  This exacting standard "gives government

22  officials breathing room to make reasonable but mistaken judgments" by "protect[ing] all but the

23  plainly incompetent or those who knowingly violate the law." Id., at 563 U.S. 731, 743.  The

24  concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to

25  the legal constraints on particular police conduct. It is sometimes difficult for an officer to

26  determine how the relevant legal doctrine, here excessive force, will apply to the factual situation

27  the officer confronts. An officer might correctly perceive all of the relevant facts but have a

28  mistaken understanding as to whether a particular amount of force is legal in those circumstances.

1   If the officer's mistake as to what the law requires is reasonable, however, the officer is entitled to

2   the qualified immunity defense. *Saucier v. Katz,* 533 U.S. 194, 205 (2001).

3         Defendants have filed a memorandum of points and authorities in support of proposed

4   special interrogatories in this case to support a qualified immunity determination. ECF 117.

5   **IV.   GOVERNMENT CODE SECTION 820.2 BARS LIABILITY FOR THE PLAINTIFF'S**
6         **BATTERY AND NEGLIGENCE CLAIMS**

7         Additionally, California Government Code section 820.2 provides immunity to public

8   employees for their discretionary acts, including when a police officer is required to make split-

9   second judgment about whether force is called for, and how much force is appropriate, in dealing

10  with a threat from a suspect. *Martinez v. County of Los Angeles,* 47 Cal.App.4th 334, 349 (1996).

11  Discretionary immunity under section 820.2 has been found to apply to many areas of police

12  work. *Conway v. Cnty. of Tuolumne,* 231 Cal.App.4th 1005, 1015 (2014). It applies to choices

13  and judgments officers make in response to changed circumstances are the type of actions

14  protected by the immunity of Government Code section 820.2. *Id.* at 1019 (Decision to use to tear

15  gas was based on personal deliberation, decision and judgment and Government Code section

16  820.2 applied.)

17        In actions involving claims under state law, an officer's use of deadly force is privileged as

18  a matter of law if he reasonably fears for his safety or that of others in the area. *Reynolds v.*

19  *County of San Diego,* 858 F.Supp. 1064, 1074 (S.D. Cal. 1994), modified on other grounds, 84

20  F.3d 1162 (9th Cir. 1996) (recognizing an officer's split second decision to use force is exactly

21  the kind of action which section 820.2 was enacted to shield from liability). A discretionary act

22  requires conscious balancing of risks and advantages when making basic policy decisions. *See*

23  *Bell v. State of California,* 63 Cal.App.4th 919, 929 (1998). A finding of section 820.2 immunity

24  requires a showing that specific conduct giving rise to the suit involved an actual exercise of

25  discretion, i.e., a conscious balancing of the risks and advantages. *Steinle v. City & Cnty. of San*

26  *Francisco,* 919 F.3d 1154, 1161(9th Cir. 2019)(quoting *Caldwell v. Montoya,* 10 Cal.4th 972

27  (1995).

28

In this case, Officer Yepez's decision to fire his weapon, based on plaintiff's actions he observed, as opposed to using different tactics in a situation that evolved quickly from checking on someone who was involved in an accident to a threat to the safety of Officer Yepez and his partner is the precise type of action that Government Code section 820.2 was designed to protect.

## V. GOVERNMENT CODE SECTION 835 BARS LIABILITY FOR THE PLAINTIFF'S BATTERY AND NEGLIGENCE CLAIMS

Peace officers are privileged under state law to use reasonable force to make an arrest, prevent an escape or overcome resistance. Cal. Pen. Code § 835a, *Hernandez v. City of Pomona*, 46 Cal.4th 501 (2009). California Penal Code section 835a provides that an officer may use reasonable force to effect the arrest, to prevent escape or to overcome resistance. Reasonable (privileged) force further bars liability against Officer Yepez, who was forced to make a split-second decision in response to Mr. Hurtado's credible threat of imminent serious harm.

## VI. OFFICER YEPEZ WAS ACTING IN DEFENSE OF SELF OF OR OTHERS

Moreover, Officer Yepez is not responsible for the plaintiff's state law claims as he was acting in self-defense and defense of others. When an alleged act of self-defense is at issue, the question of what force was reasonable and justified is peculiarly one for determination by the trier of fact. *Burton v. Sanner*, 207 Cal.App.4th 12, 14 (2012). The reasonableness standard is an objective standard. *Id.* Generally, the force that one may use in self-defense is that which reasonably appears necessary, in view of all the circumstances of the case, to prevent the impending injury. In emphasizing that the law of self-defense is a law of necessity courts should never lose sight of the fact that necessity may be either be real or apparent. *Vaughn v. Jonas*, (1948) 31 Cal.2d 586, 599-600. Additionally, a peace officer may not be deemed an aggressor or lose the right to self-defense or defense of others by the use of objectively reasonable force. Cal. Pen. Code §836.5.

## VII. MITIGATION OF DAMAGES

Defendants contend that plaintiff has failed to use reasonable efforts to mitigate damages. Specifically, he has failed to follow medical providers' recommendations since 2019.

8

1    **VIII. COMPARATIVE FAULT**

2         Defendants contend that they are not responsible for plaintiff's injuries to the extent they

3    were caused by the motor vehicle accident or plaintiff's failure to follow treatment

4    recommendations.

5                                   **EVIDENTIARY ISSUES**

6         Evidentiary issues have been addressed in motions in limine. However, Defendants will

7    object to any efforts by plaintiff to introduce any medical records, billing records, or expert work

8    or opinions that have not been disclosed.

9                              **PROCEDURAL ISSUES/WITNESSES**

10        Defendants request that the parties are required to disclose the witnesses they will be calling

11   24 hours in advance. Additionally, defendants have subpoenaed Dr. Fine, a treatment provider

12   that plaintiff identified in discovery who is located in San Dimas, California. Dr. Fine informed

13   our office that she is unable to testify in person because of an undisclosed medical issue which

14   prevents her from traveling, but is available to testify remotely via videoconference. Defendants

15   have notified plaintiff's counsel of the request and request that the court allow Dr. Fine to testify

16   remotely. Defendants will utilize the court's requirements to set up the remote testimony link.

17        Additionally, Defendants understand that plaintiff has subpoenaed numerous CHP officers

18   for the first day of trial. The officers are from out of town and must travel to Sacramento and

19   CHP has to arrange for coverage of scheduled shifts. Defendants have requested plaintiff's

20   provide a more definite time and date for the officers to appear.

21                                    **CONCLUSION**

22        Defendants respectfully submit this Trial Brief in anticipation of the March 11, 2024 trial

23   date. The foregoing is a summary of points Defendants anticipate may arise at trial. Should any

24   legal issues arise, that have not been covered in this trial brief, Defendants respectfully request

25   leave to submit further memoranda as necessary.

26

27

28

1   Dated: March 1, 2024                         Respectfully submitted,

2                                                ROB BONTA
                                                 Attorney General of California
3                                                IVETA OVSEPYAN
                                                 Supervising Deputy Attorney General
4
                                                 */s/ LeeAnn E. Whitmore*
5
                                                 LEEANN E. WHITMORE
6                                                Deputy Attorney General
                                                 JOHN C. BRIDGES
7                                                Deputy Attorney General
                                                 *Attorneys for Defendants State of*
8                                                *California, acting by and through the*
                                                 *California Highway Patrol and*
9                                                *Edgardo Yepez*

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Defendants' Trial Brief (2:19-CV-02343-DAD-AC)