# Exhibit 1

```
1                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF CALIFORNIA
2                            --o0o--

3    FRANCISCO HURTADO,          ) Case No. 2:19-CV-02343-DAD-AC
                                 )
4                   Plaintiff,   ) Sacramento, California
              v.                 ) March 12, 2024, 11:07 a.m.
5                                )
     STATE OF CALIFORNIA, et al., ) Re: Trial Day 2
6                                )
                    Defendants.  )
7

8                     TRANSCRIPT OF PROCEEDINGS
                 BEFORE THE HONORABLE DALE A. DROZD
9                   UNITED STATES DISTRICT JUDGE

10   APPEARANCES:

11   For the Plaintiff:     LAW OFFICES OF DALE K. GALIPO by
                            MR. DALE K. GALIPO
12                          21800 Burbank Boulevard, Suite 310
                            Woodland Hills, California  91367
13
                            GUIZAR, HENDERSON & CARRAZCO by
14                          MR. ANGEL CARRAZCO, JR.
                            MR. KENT MATTHEW HENDERSON
15                          18301 Irvine Boulevard
                            Tustin, California  92780
16
     For the Defendants:    OFFICE OF THE ATTORNEY GENERAL
17                          DEPARTMENT OF JUSTICE by
                            MS. LEEANN E. WHITMORE
18                          MR. JOHN C. BRIDGES
                            1300 I Street,
19                          Sacramento, California  95814

20                     MARYANN VALENOTI, RMR, CRR
                          Official Court Reporter
21                      501 I Street, Suite 4-200
                          Sacramento, CA 95814
22                      mvalenotiRMRCRR@gmail.com
                             (916)930-4275
23
     Proceedings reported via mechanical steno - transcript produced
24   via computer-aided transcription

25
```

1    the speed to be approximately 80 miles an hour.

2    A    It was in excess of 80 miles per hour.

3    Q    And did you look at this speedometer yourself?

4    A    No.

5    Q    And the speed limit there is 65.

6    A    Correct.

7    Q    At some point Officer Randazzo decides that he's going to

8    pull the vehicle over for a speed violation; is that correct?

9    A    Yes.

10   Q    And you activate the lights on the patrol vehicle.

11   A    I didn't activate them.

12   Q    Officer Randazzo did?

13   A    Yes, he did.

14   Q    And you're still obviously in the right front passenger

15   seat, correct?

16   A    Correct.

17   Q    And at some point you see the vehicle go from the one lane

18   to the two lane to the three lane, it seemed to swerve a little

19   bit back into the two lane at some point?

20   A    First I saw it swerve to the right, so out of the three,

21   kind of onto the shoulder, and then yes, it did go back into

22   the two.

23   Q    And it eventually got off at the Keyes exit?

24   A    Yes.

25   Q    And Officer Randazzo decided to turn off his lights.

Yepez - Direct by Galipo

1    A    Yes.

2    Q    Do you have an estimate as to how long the lights were on

3    for?

4    A    It's a short distance, maybe a mile, maybe 15 to 20

5    seconds.

6    Q    And are you estimating during the 15 or 20 seconds that

7    the lights of the patrol vehicle were on, that the distance was

8    about 200 feet between the patrol vehicle and the Escalade?

9    A    The 200 feet was I estimated that at the beginning when we

10   were first behind him.  The distance was growing because the

11   vehicle accelerated when we turned on our lights.

12   Q    So you believe it was more than 200 feet?

13   A    At some point?

14   Q    During the time the lights were on.

15   A    Yes, the distance was growing.

16   Q    So would it be correct to say that the lights were on for

17   about 15 or 20 seconds, and during that time frame the distance

18   between your patrol vehicle and the Escalade was a minimum of

19   200 feet, but actually it was growing and greater than that?

20   A    Yes.

21   Q    And then when did Officer Randazzo turn off the lights in

22   relation to when the vehicle got off at Keyes?

23   A    Officer Randazzo turned off the lights, we were also

24   exiting Keyes.  We were at the bottom of the offramp.  So the

25   vehicle had already exited.  It was -- I don't know where it

1    Q    Did you or your partner discuss any type of tactical plan
2    as to how you were going to approach the vehicle or deal with
3    it before you went down the embankment?
4    A    No.
5    Q    You, at some point as you were approaching the vehicle or
6    near the vehicle, heard moaning and groaning, correct?
7    A    Correct.
8    Q    And I think you gave a statement at some point after the
9    incident about what occurred; is that true?
10   A    That's true.
11   Q    And have you had an opportunity to review your statement
12   in preparation for the trial?
13   A    Yes.
14   Q    And that at some point later you also gave a deposition?
15   A    Yes.
16   Q    And in the deposition your understanding was your
17   testimony was being taken under oath, correct?
18   A    Yes.
19   Q    A court reporter was present, just like we have one here
20   in court.
21   A    Yes.
22   Q    Have you had a chance to review your deposition in
23   preparation for the trial?
24   A    Yes, I have.
25   Q    And you would agree that you indicated both in your

1   initial statement and your deposition that you heard moaning

2   and groaning coming from inside the vehicle?

3   A    Yes.

4   Q    And that was at least in your mind consistent with your

5   expectation that somebody who was in a vehicle that went

6   through a guardrail or over a guardrail, down a steep

7   embankment and ended up upside down could be potentially

8   injured?

9   A    Yes, yes.

10  Q    Now, I want to show you a few photographs.

11           MR. GALIPO:  And these, Your Honor -- I'll indicate

12  the numbers as I go, but these are admitted exhibits by

13  agreement.  I have quite a few.  Would you like me just to give

14  you all the numbers or go one by one?  What's easiest for Your

15  Honor?

16           MS. WHITMORE:  Your Honor, may I see them?

17           MR. GALIPO:  Absolutely, I already showed them to

18  counsel for my opening, but I'll show them again.

19           THE COURT:  After Ms. Whitmore's reviewed them and

20  confirmed they're the ones that you all discussed, why don't

21  you just list them seriatim, and if there's no objection, we'll

22  move them all into evidence and then they could be published.

23           MR. GALIPO:  That would be fine.

24           THE COURT:  And we don't have to keep interrupting.

25           MR. GALIPO:  So I will list them.

Yepez - Direct by Galipo

1    able to see it from that perspective; correct?

2    A    Correct.

3    Q    Before you heard your partner say, There's a gun.  There's

4    a gun, did you yourself ever see any person inside the

5    Escalade?

6    A    No.

7    Q    So for the two to four minutes approximately that you were

8    there, including the time frame that you were standing behind

9    the SUV, you would agree you never saw anybody inside, correct?

10   A    I never saw anybody, correct.

11   Q    Did you ever look or attempt to look inside the vehicle

12   during this two to four minutes that you were at the vehicle

13   with your partner?

14   A    Yes.

15   Q    And did you try to look in the rear of the vehicle?

16   A    Yes, that's where I looked from.

17   Q    And this would obviously be before your partner said,

18   There's a gun.  There's a gun, correct?

19   A    Correct.

20   Q    And what did you do to try to look in?  I'm assuming you

21   had to crouch down in order to try to look in since the window

22   would have been at the lower part of your body as you were

23   standing straight up.

24   A    I did crouch down a little, but not as much as you

25   demonstrated, but a little bit.

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

1    Q    And you had the flashlight in your left hand?

2    A    Correct.

3    Q    And you attempted to shine it in the car?

4    A    I shined it in the car.

5    Q    And for how long a period of time did you look in the car

6    with your flashlight illuminating the inside?

7    A    I looked in there, I didn't see anybody, and looked back

8    out.  Maybe -- again, you're okay with estimates?

9    Q    Of course, any range that you are comfortable with.

10   A    Maybe five seconds at most.

11   Q    So approximately five seconds; would you be comfortable

12   with that?

13   A    At most five seconds.

14   Q    At most.  So during this "at most five seconds" that you

15   crouched down some illuminating the inside of the vehicle with

16   your flashlight, am I understanding you correctly you did not

17   see anybody in the car?

18   A    Correct.

19   Q    And you certainly didn't see a gun in the car during that

20   time frame, correct?

21   A    Correct.

22   Q    As part of your training, were you trained to give

23   commands in a clear under- -- in a clear way so that people

24   could understand the command?

25   A    Yes.

Yepez - Direct by Whitmore

1    A    Not a felony high-risk, no.

2    Q    What is a felony high-risk traffic stop?

3    A    A felony high-risk traffic stop requires different

4    tactics.  During that stop we don't approach the vehicle.

5    During those stops, what we do is we place our patrol vehicle

6    actually further back than a regular traffic stop, a non high

7    risk, and we give commands to the parties in the vehicle to

8    then exit their vehicle and walk to us, instead of us

9    approaching the vehicle.

10   Q    What sort of conduct would encompass -- by the person in

11   the vehicle would encompass a high risk -- a felony high-risk

12   traffic stop?

13   A    Evading us is one.  Stolen vehicle would be another one.

14   And then there are other circumstances, situations that would

15   also merit them.

16   Q    And at anytime did you consider the attempted traffic stop

17   of Mr. Hurtado a high risk -- a felony high-risk traffic stop?

18   A    Yes, I did, at some point I did.

19   Q    When?

20   A    After he was evading us.

21   Q    How long did you consider that a felony high risk stop

22   for?

23   A    Up until we discontinued.

24   Q    So while you're on Highway 99?

25   A    Yes.

1    Q    At anytime you were down the embankment, do you consider

2    your interactions with Mr. Hurtado a felony high-risk traffic

3    stop?

4    A    There was high risk, but I think when we were down there,

5    the priority in my mind at least was to help him.

6    Q    How long had you worked with Officer Randazzo prior to

7    March 15, 2018?

8    A    That was our first month working together.

9    Q    How long -- how long had you worked together during that

10   month?

11   A    About 15 days, maybe a little less.

12   Q    Do CHP at Stanislaus officers have body cameras?

13   A    No.

14   Q    As a Highway Patrol officer, what are your job duties?

15   A    I have many.  Assisting the motoring public in any way I

16   can if they're on the side of the road.  I've changed tires

17   before.  Investigating traffic collisions and enforcing all

18   California legal codes.

19   Q    What was your assignment on March 15, 2018?

20   A    On that day I was assigned to patrol an area in Stanislaus

21   County.

22   Q    Do you recall what area that was?

23   A    Yes, that area, we called them "beats" and that's just how

24   we break up the area.  I was Beat Number 32.

25   Q    And were you the driver or the passenger in the vehicle?

1   A    It appeared to me that it was traveling at a high rate of

2   speed.

3   Q    What lane was it in?

4   A    It was in the Number 1 lane, which would be the fast line.

5   Q    Did anything about the vehicle's speed concern you?

6   A    Other than it's unsafe to drive fast.  Other than that,

7   no.

8   Q    At that time did you know anything about the vehicle

9   occupants?

10  A    No.

11  Q    Could you see the vehicle occupants?

12  A    No.

13       MS. WHITMORE:  Your Honor, at this time I would like

14  to play a portion of the MVARS, it's the Joint Exhibit Number

15  11 that was just admitted.

16       THE COURT:  You may.  Audio, video or both?

17       MS. WHITMORE:  Actually it's video and audio.  It's

18  the same program, it's just you open it with a different

19  program in order to show the video.

20       THE COURT:  That's fine.  Just so the record's clear,

21  Joint Exhibit 11 contains both an audio track and a video

22  track?

23       MS. WHITMORE:  It contains a video track, the MVARS

24  system.  If you play it on certain programs, it only plays the

25  audio.

1    THE COURT:  Okay, but you are going to use the program

2    that plays both?

3    MS. WHITMORE:  Yes.

4    THE COURT:  It's been admitted.  You may publish any

5    part of it you wish.

6    MS. WHITMORE:  Okay.  We'll start at the beginning,

7    and I'll let you know where to stop.

8    (Media is presented)

9    MS. WHITMORE:  Please stop.  I stopped at 28 seconds

10   for the record.

11   BY MS. WHITMORE:

12   Q    Officer Yepez, do you recognize the video?

13   A    I do.

14   Q    What is it?

15   A    It's our MVARS video from that night.

16   Q    Did you see the SUV in the portion of the video that you

17   saw?

18   A    Yes, I did.

19   Q    Where was it?

20   A    It was in the Number 1 lane and it just now switched to

21   the Number 2 lane.

22   THE COURT:  I'm sorry to interrupt, on the witness's

23   screen he can draw, can't he?

24   THE CLERK:  Yes.

25   THE COURT:  And are you familiar with these screens.

1          THE WITNESS:  No, I'm not.

2          THE COURT:  Could you show him how to clear when he's

3     done?

4          THE CLERK:  Sure.

5          THE COURT:  So with your finger, you could draw on the

6     screen any point you want to.

7          MS. WHITMORE:  Do you see that there, it's on the top,

8     I believe.

9          THE WITNESS:  I just have the video player.

10          THE CLERK:  In the far right corner, do you see a

11     little green arrow?

12          THE WITNESS:  Yes, now I have a pencil, do I just

13     click?  There.

14          THE CLERK:  There you go.

15          MS. WHITMORE:  Can you point to the jury where the

16     MVARS was?

17          THE COURT:  I think there is a red dot that has

18     appeared.

19          THE WITNESS:  I put the red dot to show where the car

20     is.

21          MS. WHITMORE:  He's faster than me.

22     BY MS. WHITMORE:

23     Q    Did you -- the MVARS doesn't have sounds in the 30 seconds

24     we watched; why is that?

25     A    Because it activates when you turn on the lights and then

1    it goes back 30 seconds or a minute.  I thought it was a

2    minute, but it could be 30 seconds, where it just records, but

3    there's no audio.

4            MS. WHITMORE:  I'm going to start playing again.

5            (Media is presented)

6            MS. WHITMORE:  Please stop.  We stopped at 56 seconds.

7            THE COURT:  Can you press clear on that menu on the

8    right?  So, each time you do it, if you just press "clear" once

9    you're done, it will take the mark you made off.

10           THE WITNESS:  Okay.

11   BY MS. WHITMORE:

12   Q    Where is the SUV in the image we just paused?

13   A    Right there, right where I put the dot.

14   Q    Are there any cars between you and the SUV?

15   A    No.

16   Q    Do you have an approximate distance as to how far behind

17   you are from that vehicle?

18   A    That was like 200 feet to me.

19   Q    At that point in time based on your observations, is the

20   vehicle still speeding?

21   A    Yes, it is.

22   Q    And at the point we paused there appeared to be some sound

23   coming on.  What was that sound?

24   A    That's the sound of our microphones being activated.

25   Additionally, there's the microphone inside the cabin, inside

Yepez - Direct by Whitmore

1    the patrol vehicle, so that could also be it.

2    Q    And at this point in time aside from speeding, did you

3    observe anything else about the SUV's driving that was

4    concerning to you?

5    A    At this point, no.

6    Q    Was the manner that it changed lanes concerning to you?

7    A    No, not yet.

8    Q    Based on your training and experience, did you have any

9    concerns about why the person was driving this way?

10   A    No, not at this time.

11          MS. WHITMORE:  Let's start the video.

12          (Media is presented)

13          MS. WHITMORE:  Stop.

14   BY MS. WHITMORE:

15   Q    At this point in time on the video is the SUV still in

16   front of you?

17   A    It's still in front of me, yes.

18   Q    And the sound that you hear, are the lights showing in the

19   video?

20   A    Yes, they are.

21   Q    At what point were the lights activated?

22   A    The lights were activated when he was still in the Number

23   2 lane a few seconds prior to this.

24   Q    And when were the sirens activated?

25   A    A few seconds ago when we saw that he wasn't reacting to

Yepez - Direct by Whitmore

1    our lights, sometimes we also use the siren as an additional

2    tool, or if we thought -- if we were going to be in pursuit,

3    it's required to be on.

4    Q    And did you -- so when lights are activated, what is the

5    driver supposed to do?

6    A    They're supposed to pull over to the right shoulder and

7    stop.

8    Q    And when you put the lights on, what did the SUV do?

9    A    It looked like it changed lanes from the Number 2 to the

10   Number 3, kind of went off to the shoulder, and then just

11   accelerated.

12   Q    And did its movements between the lanes cause you any

13   concerns at this point?

14   A    Yes.

15   Q    What concerns?

16   A    Based on my training and experience, aggressive lane

17   changes like that are either signs of aggressive drivers or

18   impaired drivers.

19   Q    When you put the sirens on, what did the vehicle do?

20   A    When my partner turned the siren on, the vehicle

21   accelerated, it didn't stop.

22   Q    Did you find that unusual?

23   A    Yes.

24   Q    Why?

25   A    Because most people stop.

1  Q    And what offramp were you approaching at this point?

2  A    We were approaching an offramp called Keyes Road.

3       (Media is presented)

4           MS. WHITMORE:  Stop.

5  BY MS. WHITMORE:

6  Q    What does 1022 mean?

7  A    1022 means discontinue, disregard, stop.

8  Q    What did that mean regarding your attempt to pull over Mr.

9  Hurtado?

10  A    It means we were going to 1022 or stop and just no longer

11  go after him.

12  Q    Why did you decide to discontinue the stop?

13  A    It was too reckless, high speeds.  It was -- the risk

14  outweighed the reward.

15  Q    Did you observe the vehicle almost come into contact with

16  any other drivers?

17  A    Yes, I did.

18  Q    And describe that.

19  A    After he switched lanes from the middle lane, Number 2 to

20  the right lane the Number 3, he then weaved.  He was weaving,

21  but at one point he weaved to the left where he nearly hit

22  another vehicle that was already in the Number 2 lane.

23  Q    How far is the Keyes Road offramp from where you initially

24  saw the SUV?

25  A    The Keyes Road offramp, I initially saw it at the Mitchell

1   A    I was able to smell the odor of alcohol coming from the

2   vehicle.

3   Q    Did you or Officer Randazzo handcuff Mr. Hurtado when he

4   was out of the vehicle?

5   A    Yes, we did.

6   Q    Was it both of you or --

7   A    I don't remember whose cuts we used.  I just remember him

8   getting out, him being pulled out and then we rolled him on to

9   his stomach and then we put the handcuffs on.  We probably did

10  it together.  I don't remember exactly.

11  Q    Why did you handcuff him?

12  A    It's part of our training.  He was a threat and again, he

13  had shown that he did not want contact with law enforcement,

14  and if he didn't -- we didn't know his status, to prevent

15  further fighting, for his safety, for our safety.

16  Q    When Mr. Hurtado was out of the vehicle, was he able to

17  speak with you and Officer Randazzo?

18  A    Yes.

19  Q    Did he appear to have any difficulty speaking?

20       MR. GALIPO:  I'm going object, it lacks foundation as

21  phrased.

22       THE COURT:  Sustained.  Rephrase.

23       MS. WHITMORE:  Thank you, Your Honor.

24  BY MS. WHITMORE:

25  Q    What was he saying to you?

1    A    He wasn't saying much, but I did ask him, there was a

2    point where I was down providing aid to him, and I asked him,

3    Hey, are you all right?  And then he said, Yeah, I'm just

4    drunk, and I'm blown.

5    Q    When did you stop rendering aid to Mr. Hurtado?

6    A    I didn't stop until other agencies showed up.  I don't

7    remember who the first on scene was, but somebody told us, Hey,

8    we got it.  From here you guys could go up.

9    Q    When you say "other agencies," do you recall what agencies

10   those were?

11   A    Multiple showed up.  I know more CHP showed up.  I know

12   the Stanislaus County Sheriff's Department showed up to the

13   scene.  I believe Turlock police department also showed up to

14   the scene that I remember.

15   Q    I'm going to play a portion of Joint Exhibit 11 again

16   starting at 12 minutes.

17        (Media is presented)

18   BY MS. WHITMORE:

19   Q    Officer Yepez, do you recognize the voices in that portion

20   of the video?

21   A    Yes.

22   Q    Who was speaking?

23   A    I heard myself, I heard Officer Randazzo, I also heard

24   dispatch and towards the very end I heard Mr. Hurtado.

25   Q    What did you hear Mr. Hurtado say?

1    A    That's when he said that he was "blown."

2    Q    Thank you.  When you hear "blown," what does that mean

3    based on your training as an officer and experience?

4    A    The way I take it at that point is that he was -- I don't

5    know if "high" is a better term, but just had been using -- I

6    took it as he had been using, like he was high off marijuana.

7              MS. WHITMORE:  Nothing further.

8              THE COURT:  Redirect and cross-examination, Mr.

9    Galipo.

10             MR. GALIPO:  Yes, Your Honor.

11                   REDIRECT and CROSS-EXAMINATION

12   BY MR. GALIPO:

13   Q    After the shooting it looked to you like he wanted to go

14   to sleep, didn't it?

15   A    Yes.

16   Q    And from your perspective, he was obviously hurt; is that

17   fair?

18   A    Not obviously, it appeared to me he was in no pain.

19   Q    Did you know he had gunshot wounds?

20   A    After we pulled him out of the vehicle, that's when I

21   first found out, yes.

22   Q    Right.  And you saw bleeding, correct?

23   A    Correct.

24   Q    And you and Officer Randazzo were trying to stop the

25   bleeding?

1          THE COURT:  Okay.

2          MR. GALIPO:  That's fine.  Okay, thank you.

3       (Proceedings adjourned at 5:11 p.m.)

4

5                    C E R T I F I C A T E

6

7     I certify that the foregoing is a true and correct

8  transcript of the proceedings in the above-entitled matter.

9

10  _____          October 7, 2024
                                         _____
11  MARYANN VALENOTI, RMR, CRR               DATE
    Official Court Reporter
12  CA CSR #11266

13

14

15

16

17

18

19

20

21

22

23

24

25