# Exhibit 3

1               UNITED STATES DISTRICT COURT

2              EASTERN DISTRICT OF CALIFORNIA

3                        --oOo--

4   FRANCISCO HURTADO,          ) Case No. 2:19-CV-02343-DAD-AC
                                 )
5              Plaintiff,        ) Sacramento, California
           v.                    ) March 18, 2024, 9:08 a.m.
6                                )
    STATE OF CALIFORNIA, et al., ) Re: Trial Day 6
7                                )
               Defendants.       )
8

9               TRANSCRIPT OF PROCEEDINGS
          BEFORE THE HONORABLE DALE A. DROZD
10            UNITED STATES DISTRICT JUDGE

11  APPEARANCES:

12  For the Plaintiff:      LAW OFFICES OF DALE K. GALIPO by
                            MR. DALE K. GALIPO
13                          21800 Burbank Boulevard, Suite 310
                            Woodland Hills, California  91367
14
                            GUIZAR, HENDERSON & CARRAZCO by
15                          MR. ANGEL CARRAZCO, JR.
                            MR. KENT MATTHEW HENDERSON
16                          18301 Irvine Boulevard
                            Tustin, California  92780
17
    For the Defendants:     OFFICE OF THE ATTORNEY GENERAL
18                          DEPARTMENT OF JUSTICE by
                            MS. LEEANN E. WHITMORE
19                          MR. JOHN C. BRIDGES
                            1300 I Street,
20                          Sacramento, California  95814

21              MARYANN VALENOTI, RMR, CRR
                   Official Court Reporter
22               501 I Street, Suite 4-200
                   Sacramento, CA 95814
23               mvalenotiRMRCRR@gmail.com
                      (916)930-4275
24

25  Proceedings reported via mechanical steno - transcript produced
    via computer-aided transcription

1    Pete is getting us situated here, one of the things we were

2    speaking about was all the lawyers have been busy working over

3    the weekend, a lot harder than me, I think, and as a result, I

4    can give you an update based upon that.  I am now being advised

5    it appears likely that you will hear closing arguments and

6    receive the Court's instructions by tomorrow afternoon.  So I

7    think now we're way ahead of the projected schedule, all right.

8              You may proceed, Mr. Galipo.

9              MR. GALIPO:  Thank you, very much, Your Honor.

10   BY MR. GALIPO:

11   Q    Good morning, Mr. Hurtado.

12   A    Good morning.

13   Q    I want to ask you a few additional questions about after

14   the accident had taken place and after you were in the Escalade

15   that was overturned.  Did you ever reach for the gun?

16   A    No.

17   Q    Did you ever touch the gun?

18   A    No.

19   Q    Did you ever grab the gun?

20   A    No.

21   Q    Did you ever pick up the gun and try to point it at any

22   police officer?

23   A    No.

24   Q    Were you intending to shoot any of the officers?

25   A    No.

1    Q    Could you even see any of the officers from your position?

2    A    No.

3              MR. GALIPO:  Thank you.  That's all I have.

4              THE COURT:  Any reopened cross-examination?

5              MS. WHITMORE:  Your Honor, could we have a moment to

6    confer?

7              THE COURT:  Yes.

8              MS. WHITMORE:  No questions, Your Honor.  We reserve

9    the right to call him in our case-in-chief.

10             THE COURT:  All right.  May Mr. Hurtado be excused

11   subject to recall in the defense case?

12             MR. GALIPO:  Yes, Your Honor.

13             THE COURT:  All right.  Pete.

14        (Witness is excused.)

15             THE COURT:  It's good to know that our lift still

16   works.  We use it sometimes, but for months we won't, and

17   you're never quite sure whether when you try it if it's going

18   to work again.

19             Mr. Galipo?

20             MR. GALIPO:  Yes, subject to any discussions regarding

21   exhibits and the joint exhibits the parties are working on

22   preparing for the jury, plaintiff rests.

23             THE COURT:  And reserve motion at this time to take up

24   later outside the presence?

25             MR. BRIDGES:  Yes, Your Honor.

1          THE COURT:  May Mr. Chapman be excused?

2          MR. BRIDGES:  Yes.

3          MR. GALIPO:  Yes, Your Honor.

4          THE COURT:  Thank you, sir.  You are free to go.

5       (Witness is excused.)

6          THE COURT:  And the defendant's next witness.

7          MS. WHITMORE:  Your Honor, may we approach?

8          THE COURT:  Sure.  Do we need to take up a matter

9  outside the presence at this point?

10         MS. WHITMORE:  Yes.

11         MR. BRIDGES:  I believe so.

12         THE COURT:  Folks, I knew we were going to have to at

13 some point, I just wasn't quite sure when.  We'll get back to

14 you as fast as we can.  It will be easier for us to resolve

15 what we have to resolve by excusing you rather than trying to

16 do it by sidebar.  So stay close, and heed the prior

17 admonition.

18      (In open court outside the presence of the jury.)

19         THE COURT:  We're outside the presence of the jury.

20 Which issue, the deposition read?

21         MS. WHITMORE:  Yes, Your Honor.  I have been

22 attempting to serve Ms. Valenzuela for several weeks.  We

23 initially served American Medical Response, which is where she

24 was working at the time of the accident.  They informed us, I

25 think, the day after the deposition was served -- or the

1   subpoena was served that she's no longer at American Medical

2   Response.  They provided us her last known address and her

3   current employer.

4           We have been attempting to serve her at her current

5   address.  The process servers informed us that there's been

6   trucks in the driveway, no doors have been answered.  They've

7   gone several different times a day.  I have a phone number for

8   her that we've been attempting to call, and it just rings and

9   rings, there's no voicemail.  We attempted to serve her at the

10  ambulance and were informed she's on maternity leave.  So she's

11  unavailable for the subpoena.

12          We took her deposition back in, I believe it was 2021,

13  yes, July 2021.  Plaintiff's counsel was present at the

14  deposition and also asked her questions.  I informed

15  plaintiff's counsel last week about our efforts to serve,

16  provided them the service efforts that I have from our process

17  server, and also informed them that I would likely be doing the

18  page, line deposition testimony.

19          On Saturday I provided them a copy of the pages and

20  lines I intended to use.  I omitted that slightly on Sunday

21  because I had some page numbers wrong on the Notice of

22  Introduction.

23          This morning plaintiff's counsel gave me objections,

24  which I don't know if he's filed with the Court yet or not, and

25  identified some additional pages that he wants to read.  Some

1   of that I have objections to as far as relevance and hearsay.

2   I have not had a chance to look at it because they gave it to

3   me about 8:30 this morning.  But some of what they want to read

4   in I don't have an objection to.  And I believe they had some

5   objections to the portions I want read in.

6          Regarding the objections as to her statements about

7   what plaintiff told her about drug use, based on the Court's

8   ruling on the -- on their motion in limine, his statements that

9   day are admissible and would also go to his credibility and

10  also his recollection of events.

11         I believe they have some objections to the Glasgow

12  Coma Scale that Ms. -- I established in the deposition that

13  Ms. Valenzuela is a trained paramedic, she's trained to assess

14  those, and she assessed them of plaintiff at GCS 15, which is

15  normal.

16         THE COURT:  Okay.

17         MR. GALIPO:  So is it okay if Mr. Henderson handles

18  this particular issue?

19         THE COURT:  Of course.

20         MR. GALIPO:  Obviously, the first predicate is the

21  unavailability finding, but I'm going let Mr. Henderson handle

22  this, if that's okay.

23         THE COURT:  Of course.  Mr. Henderson.

24         MR. HENDERSON:  Thank you, Your Honor.  Just a couple

25  of things.

1   second issue is the testimony that's going to be offered is

2   under 403 cumulative, because the defendants, apparently, also

3   intend to call a Deputy Camara, and what they heard,

4   apparently, is the same conversation.  Camara was apparently

5   standing there when EMS, that's Valenzuela, was there, and they

6   both heard this -- supposedly heard this conversation with the

7   word "cocaine" mentioned, although they describe it each a

8   little bit differently.

9         But we would say that that's, at the very least,

10  cumulative to double up and try to have two witnesses testify

11  about the same information so that they can, as they have tried

12  to previously in this case, get the word "cocaine" before the

13  jury, which is extremely prejudicial.

14        My last point I would like to make is the second brief

15  that we filed, which we did set forth some excerpts of Diane

16  Valenzuela, and that's on two issues:  One is the drug and

17  alcohol issue, and the second is the Glasgow Coma Scale issue.

18  Let me go to the second one first.

19        Glasgow Coma Scale is a measurement of a snapshot --

20        THE COURT:  I know what it is.

21        MR. HENDERSON:  So when you're there 22 minutes later,

22  it's irrelevant to say what his Glasgow Coma Scale was.  If you

23  knock a boxer out in the ring and you take him out of the ring

24  to the dressing room, and they come in and he's now conscious

25  and say, Hey, look, he's got a GCS of 15, when on TV he was

1   flat on his back and unconscious 22 minutes earlier, then that

2   is not testimony that should be allowed.

3          The second thing I would say is this:  In this case,

4   and I do appreciate the Court had carefully gone through in its

5   rulings on the motions in limine, but I did want to revisit one

6   issue and that is this:  There is absolutely no linkup between

7   this testimony that would be about cocaine and anything that

8   has to really do with this shooting or the behavior of

9   Mr. Hurtado at the time.

10         Not only is it unknown to the officer, but it's worse

11  than that, and that's this:  Cocaine has an active period, a

12  psychoactive period, of between 30 minutes to an hour, maximum.

13  That's why people who do it have to continue to snort cocaine.

14  So if you used it at any point in time more than 30 minutes

15  ago, it's not psychoactive anymore.  They have no toxicologist,

16  and importantly, no pharmacologist to testify about what the

17  effects would be.  If the jury hears it, and they hear that he

18  had used cocaine that night, they will assume, with no

19  foundation, that he's under the influence of cocaine.

20         THE COURT:  I think I've heard enough.

21         MR. HENDERSON:  All right.

22         THE COURT:  Let me go to that last issue first.

23  Perhaps I should have realized, but when I issued my ruling on

24  the motion in limine, I will tell you what I had in mind, is

25  that it was my understanding that the officers, Officer Yepez

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

1    and Randazzo, were going to testify about the car, the driving

2    of the vehicle, the way it was driving when they decided to

3    pull it over, how they got involved in the situation in the

4    first place.

5            In my mind, the admission, although I had concerns

6    about it, the admission of testimony regarding what the

7    plaintiff had consumed that day, alcohol and/or drugs and

8    statements that he made to that effect, seemed to me to have

9    some relevance to support, perhaps, or at least in inference,

10   the testimony of the officers about how the vehicle was driving

11   and why they decided to pull it over.

12           I gotta tell you, maybe I should have, but what I

13   didn't realize when I made that ruling was that we were going

14   to see it on video.  The video clearly supports the officers'

15   version of what happened.

16           So I'm being straightforward with you about what my

17   frame of mind was when I ruled, but I didn't realize at that

18   time, Oh, the jury's going to see a video that shows exactly

19   what the officers are going to describe.  So in my mind, what I

20   thought was a somewhat close call as to his statements

21   regarding what he had consumed that day was tipped by, Well,

22   the defendants are entitled to put on evidence that is -- makes

23   their version seem quite reasonable as to how the car was

24   acting; that they were accurate.

25           Now that the video's in, I feel a little less so.  I

1  do have to say, now I can't unring that bell, I already ruled,

2  but how much more I want to let you ring it, I'm not sure

3  whether I should or not.  This is something, you know, back in

4  chambers I talked to my law clerks immediately after the video

5  was played, Oh, I didn't realize that at the time of pretrial

6  that I was ruling.

7       As to the efforts made, I mean, I would like to hear

8  Ms. Whitmore again regarding the efforts to serve this witness.

9  And I'm not sure I have all the specifics, and I haven't read

10  the defense brief, but, for instance, in *Thomas versus Cook*

11  *County Sheriff's Department*, 588 F.3d 445 at 48 -- 458 and 459

12  Seventh Circuit decision 2009, the Seventh Circuit decided

13  that, "A trial court did not abuse its discretion by allowing a

14  party to read a witness's deposition testimony at trial after

15  finding that the party exercised reasonable diligence in

16  attempting to secure the witness's presence.  Efforts included

17  the issuance of two subpoenas, a show cause order, numerous

18  phone calls and a search by a private investigator."

19       It sounds like these efforts were not quite as

20  extensive, but I think I'm leaning -- if my sense of the

21  specifics are that there were multiple efforts made to contact

22  the witness, including tracking her down at her former

23  employment and now her current employment and being told where

24  she was, but having no success in actually getting her served,

25  I think I'm inclined to find that reasonable efforts have been

1              THE COURT:  Sure.

2              MR. GALIPO:  We would submit on the unavailability.  I

3      do think counsel has made a lot of efforts, and I think the

4      trickier issue is what the Court has stated.  What the Court

5      was aware of when it made your ruling and where the case is

6      now, as the Court continues to balance the prejudice versus the

7      probative value, we just feel more than ever now -- because I

8      recall the conversation at the motion in limine was more

9      centered at Mr. Hurtado's statement that, "I was drunk and

10     blown."

11             So we just feel it's still more prejudicial than

12     probative on that issue, especially given, as the Court pointed

13     out, the video.  That's all I have to say.

14             THE COURT:  How much of a difference is there between

15     the parties as to what should or should not be read?

16             MS. WHITMORE:  Well, some of the plaintiff's testimony

17     that they want, it's kind of background stuff, I don't have a

18     problem with.

19             There's some hearsay statements they have in and some

20     relevant stuff.  For example, a portion they want, supposedly

21     an officer told her -- she can't identify the officer -- that

22     he was shot when he was running away, which is complete

23     hearsay, and there's a couple of others as to relevance.

24             I haven't looked at what his specific objections to

25     mine were.  I know one was the Glasgow Coma Scale.

1    now change it into something to soften it, I just don't think

2    that's appropriate.

3          I think especially in light of the Court's motion in

4    limine -- ruling on the motion in limine regarding reference to

5    drug use or toxicology reports, while I agree the toxicology

6    reports should be inadmissible, and obviously are based on the

7    Court's ruling, at the time of the ruling, the Court instructed

8    all the parties that this Plaintiff's statements regarding

9    substance use on the day of the incident or at the time of the

10   incident were going to be admissible.

11         Now that the plaintiffs have had an entire week to try

12   their case and the defendants essentially have just begun their

13   case-in-chief, to change the motion in limine and alter what

14   evidence we are allowed to offer just seems very, very

15   prejudicial and really changes the approach for the case.

16         I think that if we're going to go back and re-argue

17   the basis for the motion in limine, there's significant case

18   law that discusses whether the use of substances or statements

19   about the use of substances -- illegal substances, is

20   admissible at trial, and the Courts have said it is if it goes

21   to the erratic conduct of the person who is under the

22   substance.

23         THE COURT:  The problem you got here, though, is I

24   ruled the way I did because of what I thought it went to.

25         You know in the *Estate of Diaz versus City of Anaheim*,

1   Ninth Circuit, 840 F.3d 592 at 600, 602 in Note 11 in 2016,

2   concluded that, "Where there was no evidence that the decedent

3   was acting erratically at the time of the shooting, evidence of

4   the decedent's drug use at that time was unduly prejudicial."

5   And they distinguished there the decision in *Boyd*.  That wasn't

6   what I was focused on in pretrial, but now it's the only focus,

7   because now that we've seen the video is, is there any evidence

8   that the plaintiff was acting erratically?

9           MR. BRIDGES:  Yes, there is, Your Honor.

10          THE COURT:  What?

11          MR. BRIDGES:  When the police officer tells him to

12  stop moving and show his hands, and the evidence of Officer

13  Yepez that he reaches and tries to grab a loaded firearm that's

14  sitting within a foot of his body.

15          THE COURT:  Well, come on.

16          MR. BRIDGES:  I don't believe, "Well, come on" --

17          THE COURT:  The evidence is undisputed in response to

18  my own question that nobody could have known whether that

19  firearm was loaded or not at the time.  You can't look at it

20  and tell.

21          MR. BRIDGES:  The plaintiff --

22          THE COURT:  In fact, I venture that if I posed another

23  question to that same witness, Could you look at it and tell

24  whether the safety was on from 8 feet away, that the witness

25  would have said no.  So, I mean, you can make those arguments,

1   but they're all after the fact.

2           MR. BRIDGES:  The issue, Your Honor, is not that.  The

3   issue is that the plaintiff knew the gun was loaded, and the

4   plaintiff knew that he was on drugs at the time and

5   intoxicated.  And he makes an erratic movement to grab the gun

6   when there are two police officers standing right outside the

7   car, after he's been instructed not to move and to show his

8   hands.  It goes his credibility.  It goes to his state of mind.

9           The defense will be incredibly prejudiced if the Court

10  now decides at the eleventh hour, in the middle of our

11  case-in-chief, to change the rulings in the motion in limine to

12  prevent us from offering evidence that we've been relying upon

13  throughout this trial.

14          And frankly, Your Honor, in our motion in limine or

15  our opposition to the Plaintiff's motions in limine about this

16  issue, we didn't ever say that it had anything to do with the

17  operation of the motor vehicle before the plaintiff crashed his

18  car.  We talked about it for this very reason.

19          THE COURT:  No, you didn't.

20          I re-reviewed it at the lunch break.  You didn't, as

21  far as I'm concerned.

22          MR. BRIDGES:  If Your Honor could enlighten --

23          THE COURT:  I'm going to severely limit you.  You're

24  going to get this in one time and one time only.

25          MR. BRIDGES:  Which thing?  I just want to be clear so

1    we don't overstep any lines going forward, Your Honor.

2            THE COURT:  What do you want to read?  Maybe I should

3    reconsider whether you took reasonable efforts.

4            MS. WHITMORE:  Your Honor, we would read the

5    statements to the paramedic that he drank alcohol and that he

6    took cocaine.

7            THE COURT:  That would be at Page 25, 26, Lines 25 and

8    26, or thereabouts?

9            MS. WHITMORE:  Let me get there, Your Honor.  There's

10   additional -- you're only referencing the drug and alcohol

11   references, correct?

12           THE COURT:  Right.

13           MS. WHITMORE:  Because we have other portions we're

14   reading.

15           THE COURT:  Sure, I understand.  Look, we know -- we

16   all agree what we're talking about.  The plaintiffs don't want

17   to reference -- the plaintiff doesn't want a reference to

18   "cocaine."  I've discussed why I ruled the way I ruled,

19   pretrial.  And I don't disagree with you that I can't

20   completely, in the middle of trial, now that -- evidence that I

21   just didn't snap to the fact, but the main thing I was focused

22   on in permitting that was -- has now been irrefutably

23   established by the video, because I just didn't snap to the

24   fact that there was going to be video evidence of the driving

25   pattern at the time.

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

1          I certainly -- I can only tell you, I was not focused

2     on any suggestion that the plaintiff's behavior, while lying on

3     the roof of the car, was at issue here.  If I had, I think my

4     ruling may have been different.  That's just --

5          So we're talking about reference to "cocaine."  It's

6     what the plaintiff wants out.  I ruled the way I did.  I'm not

7     going to change that ruling now.  I think it arguably has some

8     conceivable possible relevance to explain plaintiff's response

9     or nonresponse at the time, although, certainly, another

10    reasonable take on the evidence would be no, somebody's who's

11    dazed, who's just tumbled down an embankment and ended up

12    upside down on an overturned car isn't going to be particularly

13    quickly responsive to anything.  That's certainly reasonable,

14    too.

15         I'm going to allow a reference to what he said to the

16    paramedic regarding drinking beer and taking cocaine tonight,

17    but I don't want to -- I don't want multiple sections where

18    that's gone back to where cocaine is referenced a second or a

19    third time.

20         MS. WHITMORE:  Your Honor, in her -- in

21    Ms. Valenzuela's deposition testimony it's not.  It's page -- I

22    think there's a reference to smelling alcohol on the breath in

23    another section, but the cocaine -- the reference with cocaine

24    is Page 50, Lines 25 through Page 51, Line 17.

25         MR. GALIPO:  But there's multiple references in that

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

1          THE COURT:  Yes, just come back into the courtroom and

2     either Pete or Anabelle will bring you back to chambers.  Thank

3     you.

4          MR. GALIPO:  Thank you.

5        (Proceedings adjourned at 3:59 p.m.)

6

7                    C E R T I F I C A T E

8

9      I certify that the foregoing is a true and correct

10    transcript of the proceedings in the above-entitled matter.

11

12

13    MARYANN VALENOTI, RMR, CRR          October 9, 2024
      Official Court Reporter                    DATE
14    CA CSR #11266

15

16

17

18

19

20

21

22

23

24

25

                MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275