Humberto Guizar, Esq. (SBN 125769) hguizar@ghclegal.com
Kent M. Henderson, Esq. (SBN 139530) hendolaw@gmail.com
Angel Carrazco, Jr. Esq. (SBN 230845) angel@carrazcolaw.com
**GUIZAR, HENDERSON & CARRAZCO, LLP**
18301 Irvine Boulevard
Tustin, CA  92780
Telephone: (714) 541-8600
Facsimile:  (714) 541-8601

Attorneys for Plaintiffs I.H., et. al.

# UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| I.H., a minor by and through her mother and guardian Priscilla Macias, as successor in interest to Francisco Hurtado; E.H., a minor by and through her mother and guardian Priscilla Macias, as successor in interest to Francisco Hurtado; F.H., a minor by and through his mother and guardian Priscilla Macias, as successor in interest to Francisco Hurtado; and A.H., a minor by and through his mother and guardian Priscilla Macias, as successor in interest to Francisco Hurtado,<br><br>              Plaintiffs,<br>v.<br><br>STATE OF CALIFORNIA; CALIFORNIA HIGHWAY PATROL; EDGARDO YEPEZ aka EDGARDO LOPEZ; and DOES 1 through 100, inclusive,<br>              Defendants. | CASE NO: 2:19-cv-02343-DAD-AC<br><br>**DECLARATION OF KENT M. HENDERSON<br>IN SUPPORT OF REPLY TO DEFENDANTS'<br>OPPOSITION TO PLAINITIFF'S MOTION FOR ATTORNEYS' FEES**<br><br>[*Hon. Dale A. Drozd, District Judge; Hon. Allison Claire, Magistrate J.*] |

# DECLARATION OF KENT M. HENDERSON

I, Kent M. Henderson, do hereby declare and state as follows:

1. I am an attorney at law, duly licensed to practice before all courts of the State of California and the following Federal Courts: Supreme Court of the United States; United States Court of Appeals for the Ninth Circuit; United States Court of Appeals for the Fifth Circuit; United States Court of Federal Claims; United States District Court for the Northern, Eastern, Central and Southern Districts of California and the Eastern District of Texas. My Professional Corporation is a partner in GUIZAR, HENDERSON & CARRAZCO, LLP, counsel of record for the Plaintiffs in the above-entitled action. The facts stated in this declaration are of my own personal knowledge and/or I am informed and believe they are true and if called upon to testify as a witness, I could and would competently testify thereto.

2. What the Court saw at the two trials in this matter was the tip of the iceberg. We did huge amounts of work to prepare for trial (twice) in this case. Not all of the work that we did ends up in trial but all of it had to be done. The Defendants' Opposition, the Declaration of Leeann Whitmore and the Declaration of Jim Schratz have a number of misstatements, lay out a history of the case in a way that did not happen and are filled with pure speculation and guesswork as to what the work Plaintiffs' counsel did in this case or what the amount and type of work that a Plaintiffs' counsel in a civil rights police shooting case has to do to prove such a case. As is set forth herein, ironically, it was the Defendants' counsel themselves who made the number of hours expended go up in many instances.

3. Defendants criticize the amount of time I spent preparing for depositions, which included me taking the deposition of Defendants' retained bullet trajectory expert, Dr. Ravani. I prepared extensively for Dr. Ravani 's deposition and when I took it, I was able to demonstrate that Dr. Ravini had the entry and exit wounds backwards and in the wrong place, the trajectories

were wrong, he had less bases than the Plaintiff's expert, Jesse Wobrock, Ph.D., he had no diagrams and many other great pieces of cross-examination on Dr. Ravani.

4. This happened because of extensive preparation and review of medical records, reports, etc. to prepare for the deposition of Dr. Ravani. Defendants' Opposition and the Declarations of Ms. Whitmore and Mr. Schratz have this "if it wasn't used at trial then it didn't need to be done" aspect to them. The reality is that what occurred with Dr. Ravani is instructive. I extensively prepared for his deposition, I cross-examined him and showed he would not be believed and Defendants' counsel never brought Dr. Ravani to testify at trial (even though he was listed on the Defendants' witness list for both trials and we always had to be prepared to examine him at trial, in case he was called.

5. Instead, the Defendants' counsel, including Mr. Bridges, were left at trial ineffectively rooting around on the floor of the courtroom in front of the Jury Box trying to explain the bullet trajectories because their bullet trajectory expert had been too compromised on cross-examination in his deposition. Defendants' counsel also had to have their client, Edgardo Yepez, open himself up to further cross-examination by drawing a diagram of Francisco Hurtado's position at the time that Yepez claimed he was in when he crouched down and shot into the dark, overturned SUV. Part of the reason Defense counsel had to do this is that I prepared for Ravani's deposition. Far from time "not efficiently expended" this was time spent that was very effective – it knocked out the defense trajectory bullet expert in a case where the position of the Francisco Hurtado when shot and the bullet trajectories were very important.

6. At page 16, line 20-21, the Defendant CHP Opposition says "However, only Mr. Carrazco took Dr. Ravani's deposition." This is incorrect, I took the deposition of Dr. Ravani.

3
DECLARATION

1  At page 4, lines 1-17 of the Deposition of Bahram Ravani, Ph.D. taken on April 19, 2023, it states the following:

"BE IT REMEMBERED THAT, pursuant to Notice of Deposition and on Wednesday, April 19, 2023, commencing at the hour of 10:12 a.m., remotely via Zoom, before me, RICK GALTEN, a Certified Shorthand Reporter for the State of California, there appeared BAHRAM RAVANI, Ph.D.,

Called as a witness by the Defendants, and who, having been first duly sworn, was thereupon examined and testified as hereinafter set forth.

--o0o--

EXAMINATION

**BY MR. HENDERSON:** Q. Could you please state and spell your name for the record.

A. My name is Bahram Ravani. I spell it B-a-h-r-a-m, last name is R-a-v-a-n-i.

Q. Okay. And have you given your deposition before?" (See Copy of relevant portions of Deposition of Bahram Ravani, Ph.D. at Exhibit No. 1, emphasis added).

    7.    Defendants' Opposition in a completely unsupported way, claims that "Plaintiff's total attorneys' fee award be cut in half because of their limited success." (Defs' Opp., page 1, lines 15-16). This conclusory "let's just cut it in half" in a case the Plaintiffs won has no basis. The reality is that all of the work claimed was necessary.

    8.    Defendants' Opposition contends that it was "duplicative" for the Plaintiff to have two and sometimes, three, attorneys at trial. Defendants seem to suggest that I and/or Mr. Carrazco did not need to be present a trial. (See Defendants' Opposition page, 15, lines 22-28, page 16, lines 1-12). Defendants state that they (who did not have any burden of proof) needed two attorneys but the Plaintiffs did not. This makes no sense and reflects that Defendants and

Mr. Schratz do not know or appreciate what it takes to prove a Plaintiff's side civil rights police shooting case.

9. In every Plaintiffs' civil rights case I have tried there are always two to three Plaintiff's attorneys even if they don't do the questioning. Angel Carrazco and I were working the whole time in this trial. Mr. Galipo, Mr. Carrazco and I would consult and confer with each other on the testimony, exhibits, things to do and bring out, things to not do and point out, all of the exhibits we need to have ready, where the witnesses are on planes and Ubers – the idea that this all just happens with no work by more than just the attorney asking the questions is silly. You have to be present at trial to know what is going on and how the evidence is going in -- listening and observing the testimony, the inflection of voice and body language of the witnesses to know how they said things and what they changed in their story. The examining attorney does not always hear or see everything (he or she may be concentrating on formulating the next question). I have done both. When I am doing the examination, it is not uncommon for me to ask my colleague, "did I hear him say such and such?" This was the same here – Mr. Galipo is very, very good but he is also inclusive and welcomes feedback and suggestions -- we worked as a team at trial. Additionally, recall that Mr. Galipo and Hang Le came into this case later and the attorneys and staff at Guizar, Henderson and Carrazco, LLP, including but not limited to Angel Carrazco, Jr., Chris Holm, and I, etc. worked on the case for years before it went to trial

10. We all worked as a team and it took a lot of communication and updating to put on the trial. Putting on a Plaintiff's side Federal Civil Rights police shooting case trial is like putting on a Broadway Show -- you have to get all the physical evidence (like sets) and all the witnesses (like actors) in place and to deliver the evidence in court. You have to dot all the "i's" and cross all the "t's". It requires tremendous amounts of work as was done by Plaintiffs'

counsel and staff at both Guizar, Henderson and Carrazco, LLP and the Law Offices of Dale Galipo in this case.

11. Defendants' Opposition claims that "there were an inordinate number of inter-office conferences, duplicative billing and preparation and strategy sessions" [and] "it is unclear why these were necessary, especially when they brough Mr. Galipo in to try the case for them." (Defs' Opp. Page 7, lines 6-9). The statement by Defendants in their Opposition admits that they don't know ("it is unclear"). There were not an inordinate number, what was done was necessary and Defendants have no basis to say otherwise – it is "unclear" to them because they don't know and have no foundation to say, but I do know and it was necessary.

12. The billing sheets prepared by Mr. Schratz where he cuts off hours and reduces fees with a meat axe has no bases. In today's world, of course, review of emails is essential. It is not an unceccessary task. If you didn't do it, you wouldn't know when the deposition is taking place, when are we meeting, what did you notice in the report that we can cross-examine on, etc. The idea that this was a "simple trial" and you could just roll in and do the trial with no email review, no preparation and that you can just wholesale cut hours and hours off is pure speculation by people who (obviously) have never had to prove liability and damages for a Plaintiff in a police shooting case in Federal Court.

13. The case was not "overstaffed." We have zero incentive to "overstaff" a case. A civil defense attorney (perhaps like Mr. Schratz or the civil insurance defense attorneys he scrutinizes) may have some incentive to overbill because they charge by the hour. Even though a civil rights police shooting case settles less than a general civil case, they still settle much more than they proceed through a full trial (let alone two full trials) and many more times than there is a unanimous verdict for Plaintiff and an Attorneys' Fee Motion. A Plaintiff civil rights attorney

(like myself and which Ms. Whitmore, Mr. Bridges or Mr. Schratz are not) has limited resources, limited staff and limited time.

14. The most likely result is that the case will settle and we work on contingency and can get awarded attorneys' fees only if we prevail with a unanimous verdict, so while we keep track of our time, all the incentives are in favor of doing the case the most efficiently possible. We are in no way trying to overbill, overstaff or block bill. (these may be concepts in civil defense case like insurance defense auto but they are not present in a Plaintiff's civil rights police shooting case). In these Plaintiff civil rights police shooting cases we try to do them as efficiently as we can, the whole time also understanding we also have the burden of proof and we have to prove every element of the claims, including damages.

15. In this particular case much of what we had to do was driven by the Defendants and their counsel who made us produce extra unnecessary reports and depositions, made us subpoena records for trial because they flat-out refused to stipulate to simple things like authenticity and foundation and who even made us subpoena **CHP Officer** Michael Randazzo – and they made us subpoena him both times – twice.  Almost every defense counsel I have dealt with previously will stipulate to authenticity and foundation (but not ultimate admissibility) of official reports, medical records and bills that have been produced in litigation and used by all the parties and by the applicable experts throughout discovery.

16. Ms. Whitmore refused to stipulate to hardly anything and this meant we had to contact, draft subpoenas and have them served (even for the records).  Ms. Whitmore has now, apparently had a conversion to the idea that this was a "simple trial" but it was anything but simple when Defendants and Ms. Whitmore disclosed nine (9) retained experts, refused to stipulate to the authenticity and foundation of multiple records and wouldn't even stipulate to the

authenticity and foundation of the **CHP** MAIT records (when she represents the CHP) and wouldn't voluntarily produce **CHP Officer** Michael Randazzo. It was Ms. Whitmore's prerogative to make it more difficult for us by not stipulating and making us undertake additional efforts to have to subpoena the custodians of records of places like medical providers (even when everyone already had the records) and when Defendants disclosed fully nine (9) retained experts, but then Defendants (and Ms. Whitmore) should not complain that "oh wait a second why was there so much work involved?"

17. For the first trial in March 2024, we had to do substantially more work because Ms. Whitmore would not stipulate to things that pretty much every other counsel does. Our office ended up having to do twenty (20) record subpoenas and forty-three (43) appearance subpoenas [including for custodians of records] for the March, 2024 trial because of Defendants' counsel's position on authenticity and foundation (vs. 3 appearance subpoenas and 3 records subpoenas for the second trial).

18. On February 8, 2024, at 5:09 p.m., I sent an E-Mail to Defendants' counsel LeeAnn Whitmore that stated, in part, "**Are you stipulating to authenticity / foundation on those exhibits? If not, does Plaintiff need to subpoena them from the CHP?**" The stipulation I sought on various records (some of which were produced in the case by the CHP itself) were just to stipulate to authenticity and foundation, not admissibility but they wouldn't even do that. (See Copy of E-Mails at Exhibit No. 2, emphasis added).

19. On February 9, 2024, at 10:04 a.m., Defendants' counsel LeeAnn Whitmore sent me the following email: "**I will not stipulate to the authenticity or foundation** of JT-4, 6, 7 and 8 and 10." These exhibits were treating healthcare providers medical records and bills that

had been produced in the case, and relied on by various experts on both Plaintiff and Defendants' side. (See Copy of E-Mails at Exhibit No. 2, emphasis added).

20. Ms. Whitmore's February 9, 2024, E-Mail went on to state "For plaintiff's exhibits, **<u>I will not stipulate to the authenticity and foundation</u>** of Exhibit of Plaintiff's exhibits 1-3 as **I believe they were taken by Stanislaus County Sheriff's department**. **<u>I will also not stipulate to the authenticity and foundation</u>** of Plaintiff's 4 MAIT photographs, as it is overbroad. **Any subpoena should be issued to Valley Division MAIT located in Fresno**, Califonria [sic.]. MAIT is CHP MAIT. I had to prepare a subpoena to CHP MAIT and have it served on them, because the attorney for the CHP would not stipulate to the authenticity and foundation of CHP MAIT documents that had been produced and used in the case. This was incredible, Ms. Whitmore would not even stipulate to the authenticity and foundation of the records from her own client, CHP (MAIT Division) and made us do another subpoena. So, we had to expend attorney and staff time to draft, serve and keep track of subpoenas because Ms. Whitmore wanted to do it that way. (See Copy of E-Mails at Exhibit No. 2, emphasis added).

21. Ms. Whitmore's E-Mail went on to state, "**I will <u>not</u> stipulate** to plaintiff's exhibit 5 or 6 as I am not sure who took all photographs. **It appears they were takn [sic.] by the sheriff's office**. **I will also not stipulate to the authenticity or foundation of plaintiff's exhibit 9 or 10, air operations photograph and video. I believe the subpoena would be served on the Central Division air operations division**." (See Copy of E-Mails at Exhibit No. 2, emphasis added).

22. Ms. Whitmore's E-Mail went on to state, "**I will <u>not</u> stipulate to the authentic or foundation plaintiff's exhibit 11-14, the audio interview and transcript of Officer Randazzo**

9
DECLARATION

**and Officer Yepez**. Those were conducted by Stanislaus County sheriff's department." (See Copy of E-Mails at Exhibit No. 2, emphasis added).

23. Ms. Whitmore's E-Mail went on to state, "<u>I will stipulate</u> to the authenticity and foundation plaintiff's 15, <u>American Medical Response medical records</u>." Ms. Whitmore cherry-picked and stipulated to the authenticity of the American Medical Response medical records, because she felt those records had statements in them from paramedic Diane Valenzuela that contained alleged statements regarding Francisco Hurtado's alleged drug or alcohol use that she felt were favorable to her client, Defendant CHP. (See Copy of E-Mails at Exhibit No. 2, emphasis added).

24. Ms. Whitmore's E-Mail went on to state, **I will <u>not</u> stipulate to plaintiff's 16, American Medical Response billing records**. When it came to the exact same entity "American Medical Response" Ms. Whitmore would only stipulate to the paramedic records (that she felt favored her clients) but not the bills from literally the same provider. It seems impossible that the American Medical Response paramedic records could have authenticity and foundation but the bills (from the same business entity) did not. But this was Ms. Whitmore's position and so it meant that in order to prepare for trial, Plaintiff's counsel had to draft more subpoenas, track down service, makes sure served, etc. (See Copy of E-Mails at Exhibit No. 2, emphasis added).

25. Ms. Whitmore's E-Mail went on to state, **I will <u>not</u> stipulate to the authenticity or foundation of plaintiff's 25-65 and 67-74**. Plaintiff's Exhibits 25-65 were mostly medical billing records, medical bills, photos of Francisco Hurtado and some expert reports. There were numerous records in there that had been used throughout the case. The stipulation sought was

just for authenticity and foundation, not admissibility. (See Copy of E-Mails at Exhibit No. 2, emphasis added).

26. Ms. Whitmore's E-Mail went on to state, "**I will stipulate to the authenticity and foundation of** plaintiff's 66, **Bosch Crash data retrieval on plaintiff's vehicle**." Again, even as to the Plaintiff's Exhibits, Ms. Whitmore cherry-picked and stipulated only to the records she thought favored her client. (See Copy of E-Mails at Exhibit No. 2, emphasis added).

27. The Opposition suggests that the case was a "simple trial" which is completely untrue. (See Defs' Opp, page 1, line 17). The reality is that in these Police Shooting cases on behalf of Plaintiffs are very difficult and this was one of the most difficult. In this supposedly "simple trial," the Defendants disclosed nine (9) retained experts.

28. The Plaintiff has the burden of proof. I do both Plaintiff civil cases (auto and truck collisions, construction accidents, etc.) and Civil Rights cases like police shooting cases. While general civil litigation cases settle about 90-95% of the time, in police shooting cases in Federal Court, the settlement rate is lower, in my experience. Civil Rights police shooting cases are much harder to win and to settle. The more clear cases (completely unarmed victim, shot to death, in the back with body cam and witnesses) settle more often than a case like this one – presence of a gun in the car, no body cam, officer claiming gun was in victim's hand.

29. In any event, despite Defendants now saying after the verdict that the case was simple to prove that is not at all what Ms. Whitmore said during the litigation. Defendants, and especially their counsel, Leeann Whitmore, took the position that the case should be dismissed (in the MSJ) and after that was unsuccessful, that it had to be tried.

30. The case was a case in which a gun was present and the Plaintiff was claiming that although shot in the ankle, he had pain throughout his "entire body." This was due to this condition called Complex Regional Pain Syndrome (CRPS) which is complicated and difficult to

explain to jurors. (Most people upon hearing about it would say, "you're kidding, how could an injury to the ankle cause pain in the arms or the chest, or throughout the entire body?").

31. Plaintiffs' counsel had to extensively review the medical records numerous times for support of this CRPS condition and to obtain the correct experts and provide the correct medical records and bills to the correct experts, including lifetime medical care experts.

32. In situations like this, you need to have a Physiatrist, Life Care Planning expert and an economist to establish future medical care costs. This is a very difficult thing to arrange. You first need a physical medicine and rehabilitation doctor [physiatrist] (and the other doctors and psychologists) to establish what the future medical care needs are. Second, you need a Life Care Planner. Third, you need an economist to reduce the Life Care Plan medical care costs to present value.

33. One of the many difficulties is that this needs to be done in order and in Federal Court, you have to have all the experts put their opinions in a report in writing. It is like making a three-tiered wedding cake. The Life Care Planner can't do the Life Care Plan report until she has the information from the physiatrist and the economist can't do the economic damages report until he has the Life Care Plan. You have to start the process very early and in stages and it takes a huge amount of planning, work, review and re-review to get this done.

34. At page 17, lines 16-19 of the Opposition, the Defendants criticize entries I had totaling "42.5 hours for extensive review of medical records and documents" If anything this is a conservative amount of time for this kind of work. The reality is I had to review and re-review the medical records and bills for getting the experts and reports lined up, the taking of depositions, including discussing with the other attorneys on the case (even for depositions I wasn't myself taking).

35. It should be noted, that while Defendants now claim that this type of medical review is too much, or that this case was "simple" Defendants in this case disclosed seven (7) retained experts on damages who all had to be prepared for to depose and to cross-examine: 1. Charles Filanosky, Ph.D.; 2. Peter Sfikianos, M.D.; 3. Renee Binder, M.D.; 4. Vicki Schweitzer, RN; 5. Craig Enos; 6. David Fish, M.D.; and 7. Jennfier Craigmyle. Defendants' Opposition and the Declaration of Leann Whitmore is silent on the fact that they declared all of these damages experts and we had the burden of proof to prove the damages and to cross-examine the numerous experts the Defendants disclosed.

36. Defendants retained their own expert to say that Francisco Hurtado did not have PTSD as a result of the shooting. Plaintiff's counsel and their staff had to make arrangements had for Franciso Hurtado to be examined by Defendants' retained expert, Charles Filanosky, Ph.D. (psychology) on September 13, 2021 in Stockton. In his 16-page report dated October 7, 2021 (which Paintiff's counsel had to dissect to prepare for Dr. Filanosky's deposition and possible later trial testimony), he stated, "[r]esults suggest the presence of some mixed mid general anxiety and depressive symptoms, but do not point to PTSD as an accurate diagnosis in this matter." (See Exhibit No. 3, relevant portions of Filanosky report, at page 13).

37. Defendants also retained their own expert to say that Francisco Hurtado's issues stemmed from non-compliance with prompt medical care or that his ankle pain and functionality could have been fixed by a below-the-knee amputation surgery. Again, Plaintiff's counsel and their staff had to make arrangements for Francisco Hurtado to be examined on Defendants' retained expert, Peter N. Sfakianos, M.D., (orthopedic) on September 29, 2021 in Stockton. In his 37-page report dated November 24, 2021, (which Plaintiff's counsel had to dissect to prepare for Dr. Sfakianos' deposition and possible later trial testimony), he made statements like "I also question the care rendered" (page 29); "I am not sure about an above the knee amputation,

possibly a below the knee amputation" (page 32); "these pain complaints do not make much sense, given this individual's preceding medical records where no such pain complaints aside from his right lower extremity …" (page 34); "did not follow through on any of the recommendations" (page 34 and same at page 35); "I believe that this rather complicated course of treatment, could, for the most part, have been avoided if Mr. Hurtado had been more compliant and participatory to his initial treatment recommendations" (page 37); "I treated patients in the military with worse injuries who achieved better outcomes" (page 37). (See Exhibit No. 4, relevant portions of Sfakianos report, at page 13).

38. In a similar vein, Defendants' other damages experts, Renee Binder, M.D.; Vicki Schweitzer, RN; Craig Enos; David Fish, M.D.; and Jennfier Craigmyle, had opinions that Mr. Hurtado was not actually hurt so bad that he needed any very expensive future medical care, his past medical bills were too expensive, and he didn't really have very large damages in this case. While not discussed at all by Defendants now, yes, Plaintiffs' counsel had to extensively prepare for this full court press of "you only have very limited damages" that Defendants appear to now have amnesia that they did. Medical records and bills had to be extensively reviewed depositions prepared for and taken and then, the very real possibility that Defendants' disclosed Rule 26 retained damages experts would testify at trial. Defendants' counsel ended up not calling them (which was their choice and may be a testament to the hours and hours of preparation that was spent by Plaintiff's counsel to prepare the damages case for trial). The reality is that it would be only a fool who would not prepare for the Defendants to call their retained, disclosed, deposed, damages experts at trial.

39. In Leeann Whitmore's Declaration, paragraph 2, she states, "There was minimal written discovery other than the Initial Rule 26 Disclosures and Rule 26 expert disclosures." This is not true. There was actually quite a bit of written discovery. Plaintiff propounded a

14
DECLARATION

Request for Production of Documents; Plaintiff responded to Interrogatories from Yepez, Response to Request for Production, 15 subpoenas by defense, numerous medical exam requests, production of voluminous medical records from multiple sites, etc. Ms. Whitmore even requested additional medical records on multiple occasions including from Plaintiff's counsel that then required our office to contact the medical providers (like Dr. Stephenson's office and the Ketamine Clinic) to get the additional records.  Some of this includes that Francisco Hurtado got some on-going treatment (including at a Ketamine Clinic) and while it was fine for Ms. Whitmore to request additional records it is not so great to forget it happened or to suggest or ask "why did the Plaintiff's attorneys have to take all this time and effort?"

40. Defendants' Opposition claims that we should not have spent so much time on the treating doctors because only one ended up testifying at trial -- Dr. Braaton.  (See Defs' Opp. at page 5, lines 13-27; page 18, lines 4-7).  The discussion at page 5 has this whole aspect of the claim by Defendants being that "only if it ended up being used at trial was it necessary."  Such a concept is something that any Plaintiff's civil rights trial lawyer would tell you is not true.  You have to prepare to bring all the evidence to trial – have the witnesses under subpoena and ready to go.  Dr. Braaton was not the only treating doctor and we did not know if he was all we would need in the final analysis. Defendants' Opposition makes the incredible statement that because Dr. Braaton was the only non-retained medical provider called at trial, then "all of the billing for roeview of medical records by Mr. Henderson, Mr. Carrazco or their law clerk should be disallowed." (Defs' Opp., page 18, lines 3-7). This is unfounded to disallow all that work we had to do.

41. We had numerous treating doctors under subpoena and the fact that Dr. Braaton's testimony turned out well is a testament to our preparation which included sorting through and having ready all of the medical witnesses.  The Defendants did not stipulate to the authenticity

and foundation of the medical records and bills so, yes, we had to be prepared to bring everything. The fact that Plaintiff made a strategic decision to only use Dr. Braaton among the treaters (after being prepared and having under subpoena other healthcare providers) doesn't mean that all the work we did to prepare is "unnecessary." In fact, Defendants made a strategic decision to not call any of their seven (7) disclosed, retained, listed on the witness list, damages experts at the first trial but we had to plan for the Defendants bringing those experts and we had to plan on cross-examining them (reviewing the underlying medical records, reports, depositions, etc.)

42. At paragraph 5 of her Declaration, Ms. Whitmore says she expressed concern about taking expert depositions in March, 2022 and that it was me who sort of made her take expert depositions even though she now says she didn't really want to. The reality is that we were under a Scheduling Order and we needed to take expert depositions. The Docket in this case reflects at Entry No. 34, on January 25, 2022 that the Rebuttal Expert Disclosure date was continued to February 8, 2022 based on the Stipulation of the Parties. (Doc. 34, Minute Order filed 01/25/2022). In fact, Ms. Whitmore was very insistent on taking the Plaintiff's experts' depositions and they were all taken before trial whether at that time from Spring of 2022 onward (which was the appropriate time) or whenever, they still would have had to be taken.

43. It is true that I was diligent and believed that we needed to take the expert discovery and comply with the Court's Scheduling Order, and for that I make no apology that once we had Rebuttal Expert Disclosure, yes, it was time to do the experts' depositions. It makes zero difference in terms of the work expended when the expert depositions were taken because all that work had to be done and the attorneys' fees expended because Defendants (despite what they say now) insisted on all the experts in this case being deposed and the proof is that they did take and defend all those expert depositions before trial.

44.    There are deposition transcripts for all the experts in this case Defendants forced to trial two (2) times and, of course, we had to extensively prepare for those expert depositions and take them. What were we supposed to do, not take the expert depositions before trial? Are the Defendants really saying we can't charge for preparing for and taking the expert depositions, including the nine (9) experts Defendants chose to disclose.  In preparing for these expert depositions, Mr. Carrazco and I would sometimes assist each other in pointing out the parts that needed to be questioned on (including that this type of case is an organic thing that you get information in one part of the case and then share it where it important to another lawyer who is going to take the opposing expert deposition).

45.    This statement in paragraph 5 in the Whitmore Declaration that the life care plan and the economic damages reports had to be revised because the depositions were taken too early is untrue.  The truth is just the opposite. The Plaintiffs' Life Care Plan (Mary Meinhard) and the Economic Damages Report (James Mills) were done by Plaintiffs' experts in accordance with Rule 26 and then their depositions were taken.  After their depositions were taken, the trial date was continued.

46.    What really occurred is that both Ms. Meinhard and Mr. Mills could have used their same reports and just adjusted the figures for the passage of time and the new trial date. Both Ms. Meinhard and Mr. Mills agreed that they could do it that way and that they had done it that way in the past when a trial date was continued. I specifically told Leeann Whitmore that Life Care Planner Mary Meinhard and economist James Mills did not need to revise the life care plan or the economic damages report because they could just testify to the adjustments based on the time that had passed. But Ms. Whitmore *insisted* that Ms. Meinhard and Mr. Mills would have to do new reports and be re-deposed.  It was Ms. Whitmore who made all of this extra work

1  which was unnecessary have to be done.  Now, the Defendants apparently don't want to pay for

2  it even though they made it happen.

3

4       47.     Jim Schratz has a website.  See https://www.jimschratz.com/About-Jim-Schratz-

5  And-Associates.  Mr. Schratz website basically describes his services as Insurance Claims

6  Handling and Legal Audits.  He is clearly someone whose work is almost all audits of insurance

7  defense firms and insurance claims handling.  Despite all the attention given to a "Sacramento"

8  billing rate, the address of Jim Schratz and Associates is in Sonoma, California (not Sacramento)

9  and his Declaration submitted in this case was executed in "Norwell, Massachusetts" (which

10 isn't even in California).

11

12      48.     Mr. Schratz and Defendants' Opposition has this "Sacramento area attorneys"

13 standard in it, but there is no evidence that Mr. Schratz practices in Sacramento or that he has

14 any experience at all in Plaintiff's Civil Rights Police Officers shooting cases.  In fact, in

15 paragraph 40 of his Declaration, Mr. Schatz discusses his basis as only being conducting

16 "audits", lists only one case where he did an audit that was in Sacramento County Superior Court

17 (not Federal Court), and Mr. Schratz, lists cases that include from the Northern District of

18 California, Sonoma County, Alameda County, the Southern District of Ohio, and the Eastern

19 District of Virginia (not sure how "Sacramento area" billing is informed by "Southern Ohio" and

20 "Eastern Virginia").  Mr. Schratz's experience from looking at his Declaration and his website is

21 civil defense and insurance claims, not Plaintiff's Civil Rights litigation.

22

23      49.     From what he has submitted, it appears that Mr. Schratz has never had to put

24 together the proof as a Plaintiff's attorney for a police shooting case.  Mr. Schratz appears to

25 know nothing about being a Plaintiff's civil rights police shooting attorney with the burden of

26 proof and how much work is required to prove such a case.  His "audits" appear to be of almost

all civil defense attorneys, and it doesn't appear from what he has submitted and his website that he knows anything about actually having to prove a civil rights shooting case on behalf of a Plaintiff.

50. Defendants' Opposition also criticizes Mr. Carrazco for spending what they think is "unnecessary" trial preparation time, but the reality is that Mr. Carrazco would prepare witnesses including the Plaintiff in this case and Defendants criticism of what they think is too much is unfounded. We needed to do everything we could because Defendants insisted on going to trial, not stipulating to things other attorneys do, subpoena custodians of record and even witnesses they controlled (even **CHP Officer** Randazzo) and after they disclosed nine (9) retained experts and challenged the credibility of the Plaintiff.

51. Additionally, we had to retain a bullet trajectory analysis expert, Jesse Wobrock, Ph.D., because Defendant Edgardo Yepez (and the CHP) insisted that Mr. Hurtado was in a certain position and represented a threat that required deadly force. It should be noted that Mr. Carrazco had to prepare extensively to take the depositions of Defendant Edgardo Yepez and CHP Michael Randazzo and this evidence from those depositions was key and used by Mr. Galipo in trial (as was the bullet trajectory evidence of Jesse Wobrock, Ph.D.).

52. The billing I (and Mr. Carrazco and the other Plaintiffs' attorneys) did in this case was not "block billing" as claimed by Defendants. (See Defs' Opp. Page 14, lines 19-28, page 15, lines 1-3). It was billing of the time spent some of which were whole days in trial or other tasks that took numerous hours.

53. Defendant CHP would not pay the experts in the way that is customarily done. Experts expect to be paid at the time of their deposition. Ms. Whitmore insisted that the State of California required "Payee Data Forms" that had to be filled out and that made the Plaintiffs' experts await payment. It is not even clear that this is code complaint, but we were forced to

undertake extra time to arrange all this with these Payee Data Forms. It required extra work to satisfy defense counsel, Ms. Whitmore and the CHP.  If Defendant CHP insisted on it, now they have to pay for the time we had to undertake to do that – it was them who required it. We were forced to trial (twice). The Court should award all of the time we had to spend in this case.

54. I spent 10.5 hours doing work related to Plaintiffs' Reply in Support of Plaintiffs' Motion for Attorneys' Fees. I reviewed Defendants' Opposition, James Schratz's Declaration and attached exhibits, Leeann Whitmore's Declaration and attached exhibits. I searched for emails from my firm related to issues and contentions raised in Defendants' Opposition to compare actual communications to Defendants' contentions. I looked up this case's docket on Pacer to check the deadline dates in the Scheduling Order for expert discovery and other issues in order to compare Defendants' contentions. I reviewed the case file to find written discovery and subpoenas issued in order to compare them to Defendants' contentions in their Opposition and to confirm that there were significant discovery done as opposed to what was asserted in Mr. Schartz's and Ms. Whitmore's declaration. I researched Mr. Schartz and reviewed our firm's attorney and staff billing sheets to the contentions in Defendants Opposition. I drafted and edited this declaration.

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct.  Executed this 14th day of January , 2025, at Tustin, California.

/S/ Kent M. Henderson
_____
Kent M. Henderson, Declarant