# Exhibit 4

*Peter N. Sfakianos, M.D.*
*Diplomate, American Board of Orthopaedic Surgery*

November 24, 2021

Rob Bonta, Attorney General
State of California
Department of Justice
1300 I Street, Suite 125
P.O. Box 944255
Sacramento, CA 94244-2550

**RE:   INDEPENDENT MEDICAL EXAMINATION**
Francisco Hurtado vs. State of California, et al.
Case No.: 2:19-cv-02343-TLN-AC
Date of Accident: 15 March 2018
FRANCISCO HURTADO

Mr. Hurtado was seen and evaluated in my Stockton office on 29 September 2021 for the purpose of the following report. The history, to the extent that it was allowed, was obtained directly from Mr. Francisco Hurtado. He was accompanied to his examination by Bettie de Bruyn. Ms. de Bruyn audio-recorded the proceedings, as did we.

Medical records provided for review come from the following sources: Memorial Medical Center, Christopher Fischer, M.D., Cognet Rehab Solutions, Comprehensive Spine & Sports, Stanislaus County Sheriff's – Medical, Topher Stephenson, M.D., Paul J. Braaton, M.D., American Medical Response, Pledge Medical, Jeff Anderson, D.C., and Rincon Physical Medicine & Rehabilitation.

Nonmedical records provided for review come from the following sources: Traffic Collision Report from the date of the subject accident, California Highway Patrol – Emergency Medical Report, Injury Photographs, Second Amended Complaint for Damages, Answers to Second Amended Complaint, Probation Records, Employment Records, Deposition of Edgardo Yepez, Deposition of Francisco Hurtado, Video-Deposition of Officer Michael Randazzo, and the Video-Deposition of Diana Venezuela.

Except for the section of this report entitled "Medical Records Review," account of accident, treatment, and historical aspects of this evaluation are obtained directly from Mr. Hurtado.

1580 Creekside Drive, # 100
Folsom, California 95630

documented by the neurosurgeon, Dr. Eckermann, to be reasonable and appropriate as well.

I do not believe the treatment rendered at the hands of Chiropractor Jeff Anderson to be optimal in any way, or responsive to Mr. Hurtado's ongoing musculoskeletal/neurologic complaints, as Mr. Hurtado did not suffer the type of axial skeletal injuries that would be deemed responsive to chiropractic treatment/spinal manipulations. I would add, chiropractic treatment does not take the place of a well-formulated course of physiotherapy.

I also question the care rendered, accomplished through Comprehensive Spine & Sports Center, as the care appears to have been rendered exclusively within the medical-legal arena. Certainly, the billing records from that facility/entity are quite suggestive of the same.

I do believe that the evaluation and treatment rendered by Dr. Joshua Prager represents a reasonable and appropriate response to Mr. Hurtado's ongoing difficulties with respect to his diagnosis of a severe complex regional pain syndrome. Along those lines, the most recent procedure performed, that of a right lumbar sympathetic block, accomplished on 22 June 2021, did hold out some promise.

At the time of our evaluation, Mr. Hurtado possessed signs and symptoms quite suggestive of his underlying working diagnosis, that of a complex regional pain syndrome. He exhibited signs and symptoms in line with right L4, L5, and S1 motor and sensory dysfunction.

From an orthopedic perspective, Mr. Hurtado demonstrated significant atrophy of his right lower extremity, along with a 45-degree flexion contracture of the right ankle, to go along with a milder cavus deformity of the right foot.

Lastly, in conjunction with his nerve injury, Mr. Hurtado possessed a contracted right great toe.

Only after obtaining optimization of his neurologic state, would orthopedic intervention be deemed appropriate which, in my opinion, would include an Achilles tendon lengthening procedure, a release of the ankle joint capsule, and depending on the degree of posttraumatic arthrosis residing within the ankle joint itself, Mr. Hurtado may indeed be a candidate for a right ankle fusion procedure, which would place the foot and ankle in a much more functional position. All of which would allow for an additional approach to Mr. Hurtado's underlying chronic pain syndrome, where use of the extremity goes a long way towards helping alleviate neuropathic symptomatology, where medication support as well as appropriately placed blocks serve as adjunctive modalities of treatment.

HURTADO, FRANCISCO                              32                                  11/24/2021

dosages of Lovenox 24 ml every 24 hours. For pain control, he was placed on a reasonable and appropriate dosage of Norco 5 mg tablets.

Mr. Hurtado followed up postoperatively with Dr. Braaton, from 28 March 2018 through 11 June 2018. Compliance issues were quickly raised and documented. Serial plain film radiographs documented the stability of the fracture fixation, along with slow but steady fracture consolidation. Also appreciated on ensuing films, was evidence of posttraumatic arthrosis involving the ankle joint itself.

Mr. Hurtado was seen and evaluated by Dr. Jan Eckermann, a Board-Certified Neurosurgeon, for a neurosurgical evaluation, on 5 July 2018. Mr. Hurtado was referred for evaluation of possible traumatic nerve damage to the right lower extremity. Dr. Eckermann noted at the time of his history and physical examination, inherent difficulties due to Mr. Hurtado's "histrionic behavior, screaming, and erratic behavior." It was noted that narcotic pain medication was not providing much relief, which was understandable in light of Mr. Hurtado's suspected neuropathic pain presentation.

Dr. Eckermann noted on physical examination of Mr. Hurtado's lower extremities, that the exam was extremely limited due to severe pain and that he seemed to have decreased sensation to light touch in the posterior right calf in a non-dermatomal pattern.

In-order to illuminate Mr. Hurtado's neurologic dysfunction, he requested that electrodiagnostic studies be accomplished of Mr. Hurtado's bilateral lower extremities, EMG and nerve conduction testing. Dr. Eckermann also indicated a desire to refer Mr. Hurtado to a local pain management specialist, as well as a psychologist in-order to help with his emotional trauma. All of which I believe to be reasonable and appropriate recommendations put forth by the neurosurgeon, Dr. Eckermann. Unfortunately, I did not see evidence that Mr. Hurtado's lower extremity electrodiagnostic studies were ever accomplished.

Mr. Hurtado was seen postoperatively by Dr. Braaton, on 20 August 2018. It was noted that on Mr. Hurtado's last appointment on 11 June 2018, that he was allowed to weight-bear as tolerated on his right lower extremity with a new air cast cam boot and a compression stocking. He was also referred out for a course of physical therapy. At the date of this evaluation, Dr. Braaton obtained plain film radiographs which demonstrated consolidation of the pilon fracture of the right ankle, and the tibia in acceptable alignment. As mentioned previously, there was narrowing of the tibiotalar joint consistent with early posttraumatic arthritis. Dr. Braaton expressed concern regarding Mr. Hurtado's degree of compliance with regard to weight-bearing on the right side. Dr. Braaton documented that Mr. Hurtado needed to start using his foot and gradually desensitize it, "otherwise he will end up with an above knee amputation." I am not sure about an above-knee amputation, possibly a below-knee amputation. In any event, I wholeheartedly agree with Dr. Braaton,

As part of the Plan section of Dr. Braaton's report generated on that date, he put forth somewhat of a plea for Mr. Hurtado to participate in physical therapy, obtain a referral to a pain management specialist, as well as a psychiatrist. He was advised to establish himself with a primary care physician in-order to follow through on the above-stated goals/recommendations and achieve the stated goals. Unfortunately, that was not to be.

Mr. Hurtado followed up with Dr. Braaton on 21 March 2019 and 4 April 2019, having not followed through with Dr. Braaton recommendations to establish with a primary care physician. Instead, it appears that he was subsequently referred by his attorney out for chiropractic treatment.

Mr. Hurtado completed a questionnaire at Hill Chiropractic on 31 July 2019, where according to the Attending Physician's Report, Mr. Hurtado was complaining of constant neck pain which was rated a 9/10, upper back pain also rated a 9/10, frequent midback pain and constant lower back pain, both rated a 6/10, constant right leg pain which was rated a 9/10, and constant right hand and left-hand pain, both of which were rated a 10/10. Obviously, these pain complaints do not make much sense at all, given this individual's preceding medical records where no such pain complaints, aside from his right lower extremity, were recorded by any of his previous medical providers. Thus, I call into question the entire course of treatment rendered by Jeff Anderson, D.C., and certainly the chiropractic treatment does not address, to any degree, Mr. Hurtado's most crucial underlying musculoskeletal and neurologic issues. One wonders what people were thinking at that point in time.

Subsequently, Mr. Hurtado was referred to the Comprehensive Spine & Sports Center, where treatment ensued, which without doubt, was accomplished exclusively within the medical-legal arena. Aside from the historical revisionism contained within the History of Present Illness section of his report, Dr. Benjamin Schanker, did focus on Mr. Hurtado's principal and actually sole complaint at that time involving his right lower extremity. He did come up with what I believe to be an accurate assessment of a complex regional pain syndrome of the right lower extremity. I am not certain about the diagnosis of a Chronic Posttraumatic Stress Disorder. I will leave that determination to the experts in the field. What I can state from a review of the medical records that were generated through the Comprehensive Spine & Sports Center, is that the folks working through that facility certainly do know how to charge for their services. The total bill accumulated through Comprehensive Spine & Sports Center, was $33,992.48, which basically exceeds all individual cost of treatment (outside of the hospital) generated to date. Unfortunately, Mr. Hurtado's new batch of medical providers did not follow through on any of the recommendations put forth by Dr. Braaton nor Dr. Ackerman. Mr. Hurtado did not undergo electrodiagnostic testing. As far as formalized physical therapy, Mr. Hurtado was "Instructed to stay active and engage in a regimental home exercise program with stretching."

A series of interventions in the form of lumbar sympathetic blocks follow; administered at the hands of Dr. Paul Cheng, on 5 December 2019, 6 February 2020, and 20 February 2020. A clinical indication was put forth by Dr. Cheng of complex regional pain syndrome, "having already tried conservative treatments." I do not object to the diagnosis of complex regional pain syndrome, however I do quarrel with the statement "having already tried conservative treatments," as several of the above-mentioned conservative measures recommended by Mr. Hurtado's previous medical providers, were never followed through on.

Mr. Hurtado's treaters, working through the Comprehensive Spine & Sports Center, eventually put forth the recommendation that Mr. Hurtado undergo implantation of a spinal cord stimulator. However, in preparation for such interventions, it is standard care for individuals to undergo neuropsychological screening/psychological testing.

These evaluations were accomplished through CogNet Rehab Solutions by Emily Fine, Ph.D., along with the psychiatrist, Christopher Fischer, M.D. It was Dr. Fine's ultimate conclusion, after administering her presurgical psychological evaluation, that Mr. Hurtado was not a candidate for a spinal cord stimulator implant. In the conclusion section of her report, dated 22 December 2020, she wrote, "Mr. Hurtado reported or displayed four exclusionary and fifteen cautionary risk factors for poor outcome from stimulator implant. His report of personality characteristics, behavior patterns, demographic variables, and psychopathological symptoms suggest he is at significant risk for a poor response to stimulator implant, feeling nothing his doctors did helped, and negative treatment perceptions. His risk of psychopathology is fourteen times the risk of individuals with lower scores on the tests administered, and he is at double the risk of failure to return to work after stimulator implant. Additionally, his elevated scores on compensation focus, doctor dissatisfaction, borderline, and somatic complaints, have been shown to be associated with thoughts of suing a physician." She goes on to write that the patient's dependence on marijuana as his primary coping strategy, his functional impairment, and his pain sensitivity are concerning. He reported using marijuana daily, throughout the day and night to manage pain, or else he was unable to sleep, be around his family, or do anything. He indicated that he experienced pain in his foot when anyone touched it, or when anybody touches any part of his body, he feels anxious. He perseverates on the severe pain he experienced and how he "screams and cries" from the pain, and the trauma of seeing a doctor weeks after his injury because the doctor touched his foot, which made him cry. He indicated that everything makes his foot hurt, and he needed marijuana to be able to do anything.

The psychiatrist, Christopher Fischer, M.D., in his consultation note dated 11 January 2021, brought up many of the same issues. He recommended a treatment regimen in response to his diagnostic impression of Post-Traumatic Stress Disorder. It was felt that Mr. Hurtado would benefit from a trial of ketamine to address both the Post Traumatic

HURTADO, FRANCISCO                    37                    11/24/2021

I do believe that this rather complicated course of treatment could, for the most part, have been avoided if Mr. Hurtado had been more compliant and participatory with respect to his initial treatment recommendations. However, I do believe that fairly pronounced psychological/psychiatric barriers were in play which impeded and in fact stalled out his hope for progress. In other words, this would not be an optimum or desired outcome in the treatment of an open tibial plafond fracture seen along with neurovascular injury. (I treated patients in the military with worse injuries who achieved better outcomes.)

I would be happy to provide a supplemental report if any additional medical records or if Mr. Hurtado's diagnostic studies could be made available for my review.

If you have further questions regarding this individual, please feel free to contact me.

Peter N. Sfakianos, M.D.
Diplomate and Fellow, American Board of Orthopaedic Surgery

PNS:smd